549 A.2d 1323

**COMMONWEALTH of Pennsylvania**

v.

**Michael ELLIS, Appellant.**

Superior Court of Pennsylvania.

Submitted April 20, 1988.

Filed Nov. 10, 1988.

338

Robert F. Pappano, Assistant Public Defender, Chester, for appellant.

Vram Nedurian, Jr., Assistant District Attorney, Newton Square,·for Com.

Before OLSZEWSKI, KELLY and HOFFMAN, JJ.

KELLY, Judge:

Michael Ellis appeals from judgment of sentence imposed following his conviction of arson and related offenses. He contends that evidence secured during a warrantless arson

investigation search was illegally obtained, statements made by him at the hospital were the product of an illegal custodial interrogation, evidence of prior convictions was improperly used against him at trial, and his convictions were against the weight of the evidence. We find no merit in the contentions and affirm judgment of sentence.

## FACTS AND PROCEDURAL HISTORY

At approximately 6:30 p.m. on May 30, 1985, Officer Phillip Patchell, working motorcycle patrol, was dispatched to investigate a report of a structural fire at Long Lane and Pembroke near the border of Upper Darby and Lansdowne in Delaware County, Pennsylvania. He arrived a short time thereafter and discovered a house fire. After properly reporting the fire, he was dispatched to the Delaware County Hospital where two occupants of the house had been taken for emergency treatment of second degree burns.

Shortly after Officer Patchell left the scene, Officer John Egan and Fire Chief Dave Lauro arrived at the scene. Officer Egan had 14 years experience as a police patrolman; he was also the current president of the fire company and a 21 year veteran fire fighter.

Officer Egan and Fire Chief Lauro first attempted to enter the burning building to determine whether any occupants were trapped inside. Intense heat and thick black smoke drove them back. They then yelled into the house but no one responded. The fire company arrived a couple of minutes later, and the blaze was extinguished within 15 or 20 minutes.

While the fire was being fought, Officer Egan maintained crowd control. Fire Chief Lauro relayed to Officer Egan a report from firemen in the building that they smelled heavy gasoline fumes in the kitchen area. When the fire was extinguished Officer Egan and Fire Chief Lauro began to investigate the cause of the fire. In the kitchen, Officer Egan smelled a heavy odor of gasoline, confirming the firemen's earlier report.

Prior to beginning his investigation, Officer Egan received a radio report that two occupants of the residence had been taken to the Delaware County Memorial Hospital for treatment of burns. He asked the radio dispatcher to send an officer to the hospital to confirm the report, and to keep them there until he could get there to interview them. Officer Patchell and Officer Edward Hunger (who went to the hospital to provide back-up and cruiser transport to Officer Patchell in case it was necessary) both testified that they had not been directed to detain either of the occupants, that they had taken no steps to detain them, and in fact did not speak to either of the occupants. Officer Hunger indicated that if either had attempted to leave he would have asked them to stay until Officer Egan could come to get information for his incident report, but that he would not have prevented them from leaving as he had no basis to detain them. The necessity for such conduct, however, never arose; neither attempted to leave while Officers Patchell and Hunger waited for Officer Egan.

After Officer Egan made his brief initial observations in the kitchen, he asked Fire Chief Lauro to preserve the scene by keeping the firemen out of the kitchen until after he returned from interviewing the two occupants at the hospital. On his way to the hospital (which was only a ten minute drive away), Officer Egan called Delaware County Fire Marshal George Lewis requesting him to come to the fire scene because of the suspicious nature of the fire, *i.e.* the presence of the strong odor of gasoline.

When Officer Egan arrived at the hospital, Officers Patchell and Hunger left. Officer Egan then interviewed one of the occupants, whom he knew on sight as Michael Ellis, the appellant. Officer Egan knew that appellant lived at the residence which had been on fire. Officer Egan asked appellant what happened. Appellant explained that he had been in the kitchen making tea when the gas stove exploded. Officer Egan then asked about some charred paint cans he had seen in the kitchen; appellant responded that he had been painting the house a few days earlier. Finally, Officer

Egan asked appellant if there had been any gasoline or other flammable materials in the kitchen; appellant answered that there was not.

Officer Egan then spoke briefly with the other occupant, Adam Abel, who was tried as appellant's co-defendant but discharged upon a demurrer. Before leaving, Officer Egan seized the soot and blood stained clothing of the two occupants.[1]

Officer Egan then returned to the scene of the fire where he was met by Fire Marshal Lucas. The firemen were still at the scene putting away equipment and "overhauling" the rooms other than the kitchen.[2] For the next two and one-half hours, Officer Egan and Fire Marshal Lucas carefully photographed, examined, and preserved physical evidence in the kitchen area. In addition to the photographs which provided detailed evidence regarding burn patterns and charring depth necessary to reconstruct events and to establish the cause of the fire, they found and preserved partially melted plastic milk jugs which contained a liquid that smelled like gasoline (which was inexplicably poured out), and were able to establish the absence of any defect in the stove or the gas lines which could have caused an explosion as appellant had indicated had occurred. The investigation was completed by 8:30 p.m. Thus, no more than three hours had passed from the time when the fire was first reported to the time when the investigation was completed. Three days later, another search was conducted pursuant to a lawful search warrant; photographs were taken but no new evidence was seized.

On June 10, 1985, appellant was arrested and charged with arson and related offenses. A pre-trial suppression motion which sought suppression of the statements made by appellant at the hospital and the evidence seized at the scene of the fire was denied following a hearing on October

1. The clothing was not used against appellant at trial and the legality of its seizure is not before us in this appeal.

2. "Overhaul" of a fire scene is "a standard procedure whereby fire fighters search for indications that an extinguished fire could rekindle." *See State v. Moretti,* 521 A.2d 1003, 1004 (R.I.1987).

28, 1985. A jury trial commenced on November 12, 1985, and on November 14, 1985 appellant was found guilty of arson and recklessly endangering another person. Post-verdict motions were filed, argued and denied. On December 15, 1986, appellant was sentenced to an eleven and one-half (11½) month to twenty-three (23) month term of imprisonment on the arson conviction and a concurrent six (6) to twenty-three (23) month term of imprisonment on the recklessly endangering another person conviction.

Timely notice of appeal followed. We find no merit in any of the four contentions raised on appeal. We shall discuss each *seriatim*.

## I. WARRANTLESS FIRE INVESTIGATION

Appellant first contends that the trial court erred in failing to suppress the fruits of the warrantless fire investigation. Appellant argues that the search of his home did not come within the fire investigation/exigent circumstances exception as explained by the United States Supreme Court in *Michigan v. Tyler*, 436 U.S. 499, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978) and *Michigan v. Clifford*, 464 U.S. 287, 104 S.Ct. 641, 78 L.Ed.2d 477 (1984). Appellant argues that the search was for the purpose of gathering evidence and that no exigency justified Officer Egan's failure to get a warrant before continuing his search after he returned from the hospital. Appellant misconstrues *Tyler*, *Clifford*, and their progeny.

### A.

Fourth Amendment proscriptions apply only when the conduct challenged violates an actual expectation of privacy which society is prepared to accept as reasonable. *See California v. Greenwood*, 486 U.S. ——, ——, 108 S.Ct. 1625, 1628, 100 L.Ed.2d 30, 36 (1988) (collecting cases). Though the Fourth Amendment protects people rather than places, the determination of whether an actual and reasonable expectation of privacy existed usually requires some reference to place. *Katz v. United States*, 389 U.S. 347,

351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576, 582 (1967); *id.,* 389 U.S. at 361, 88 S.Ct. at 516, 19 L.Ed.2d at 587 (Harlan, J., concurring).

Undeniably, one of the primary sources of a reasonable expectation of privacy is the right to exclude trespassers which attaches to private property. *See Rakas v. Illinois,* 439 U.S. 128, 142 n. 12, 99 S.Ct. 421, 430 n. 12, 58 L.Ed.2d 387, 401 n. 12 (1978). One's private residence is ordinarily a refuge wherein one's reasonable expectations of privacy are exceptionally strong. *See Payton v. New York,* 445 U.S. 573, 587–88, 100 S.Ct. 1371, 1380–81, 63 L.Ed.2d 639, 651–52 (1980).

With regard to fire damaged property, the Supreme Court explained in *Michigan v. Clifford, supra:*

'People may go on living in their homes or working in their offices after a fire. Even when that is impossible, private effects often remain on fire damaged premises.' *Privacy expectations will vary with the type of property, the amount of fire damage, the prior and continued use of the property, and in some cases, the owner's efforts to secure it against intruders.* Some fires may be so devastating that no reasonable privacy expectation remains in the ash and ruins, regardless of the owner's subjective expectations. The test essentially is an objective one: whether 'the expectation is one that society is prepared to recognize as "reasonable." ' *If reasonable privacy interests remain in the fire damaged property, the warrant requirement applies, and any official entry must be made pursuant to a warrant in the absence of consent or exigent circumstances.*

464 U.S. at 292–93, 104 S.Ct. at 646, 78 L.Ed.2d at 483. (Citations omitted, emphasis added). *See e.g. State v. Carey,* 42 Wash.App. 840, 714 P.2d 708 (1986) (no reasonable expectation of privacy under the totality of the circumstances); *People v. Zeisler,* 125 Ill.App.3d 558, 80 Ill.Dec. 736, 465 N.E.2d 1373 (1984) (no reasonable expectation of privacy under the totality of circumstances); *People v. Superior Court,* 141 Cal.Rptr. 562, 74 Cal.App.3d 488 (1977) (defen-

dant/trespasser had no reasonable expectation of privacy); *State v. Felger,* 19 Or.App. 39, 526 P.2d 611 (1974) (tenant had no reasonable expectation of privacy in apartment abandoned after the fire).

■ In the instant case, the degree of fire damage to appellant's private residence was not such as to eliminate any reasonable expectation of privacy. The majority of the damage was confined to the kitchen area. Though appellant had not taken steps to secure the property by the time the challenged search occurred, this does not establish an abandonment of the property or privacy expectations. Appellant was at the hospital receiving emergency treatment of burns received in the fire during the relevant time period. Under the standard set forth in *Michigan v. Clifford, supra,* appellant retained reasonable privacy expectations in the fire damaged property.

## B.

■ The original entry of Officer Egan, Fire Chief Lauro and the fire fighters was plainly justified by exigent circumstances:

> A burning building clearly presents an exigency of sufficient proportions to render a warrantless entry 'reasonable.' Indeed, it would defy reason to suppose that fireman must secure a warrant or consent before entering a burning structure to put out the blaze.

*Michigan v. Tyler,* 436 U.S. at 509, 98 S.Ct. at 1950, 56 L.Ed.2d at 498. The exigency which justified their original entry did not terminate when the flames were extinguished:

> Fire officials are charged not only with extinguishing fires, but with finding their causes. Prompt determination of the fire's origin may be necessary to prevent its recurrence, as through the detection of continuing dangers such as faulty wires or a defective furnace. *Immediate investigation may also be necessary to preserve evidence from intentional or accidental destruction.* And, of course, the sooner officials complete their duties, the less will be their subsequent interference with the

privacy and recovery efforts of the victims. For these reasons, *officials need no warrant to remain in a building for a reasonable time to investigate the cause of the blaze after it has been extinguished.*

*Michigan v. Tyler,* 436 U.S. at 510, 98 S.Ct. at 1950, 56 L.Ed.2d at 498–99. (Emphasis added). *See also Commonwealth v. Smith,* 511 Pa. 36, 50–52, 511 A.2d 796, 803 (1986) (Larsen, J., concurring; Hutchinson, J., joins).

■ Appellant argues that the right to remain at a fire scene for a reasonable time does not justify the instant search because: Officer Egan left the scene to interview appellant at the hospital and then returned; Fire Marshal Lucas was called to the scene after the fire had been extinguished; and, the focus of the investigation had shifted from determining the cause of the fire to discovery and preserving evidence of arson. Appellant construes *Tyler* and *Clifford* too rigidly.

In *Michigan v. Tyler, supra,* the Supreme Court explained:

The circumstances of particular fires and the role of firemen and investigating officials will vary widely ... In determining what constitutes a 'reasonable time to investigate,' appropriate recognition must be given to the exigencies that confront officials serving under these conditions, as well as to the individual's reasonable expectations of privacy.

436 U.S. at 511 n. 6, 98 S.Ct. at 1950 n. 6, 56 L.Ed.2d at 499 n. 6. *Cf. United States v. Sharpe,* 470 U.S. 675, 686, 105 S.Ct. 1568, 1575–76, 84 L.Ed.2d 605, 615–16 (1985) (the reasonableness of an investigative detention must be judged based upon reasonableness of steps taken to confirm or dispel suspicions; courts must consider the fact that events develop swiftly and should avoid unrealistic second guessing).

Here, Officer Egan began his fire investigation by confirming the firemen's reports of a strong odor of gasoline, and then continued it by going to the nearby hospital to interview the two persons believed to have been injured in

the fire. Though perhaps unusual, we cannot say that Officer Egan's investigative priorities were unreasonable. When such witnesses are available, it is possible that information provided by such witnesses may help focus the investigative efforts and thereby reduce the duration of the official intrusion upon legitimate privacy interests. Officer Egan's interview of appellant and the other person injured in the fire, though removed from the scene of the fire, was nonetheless a logical and reasonable facet of the fire investigation. *Cf. Commonwealth v. White,* 358 Pa.Super. 120, 131–32, 516 A.2d 1211, 1215–16 (1986) (it was reasonable for one police officer to detain the suspects in the patrol car while another police officer went a short distance to the scene of a suspected burglary to confirm or dispel the officers' reasonable suspicions).

Appellant's focus on the comings and goings of individual officials from the fire scene is misplaced. In *Michigan v. Clifford, supra,* the Supreme Court held that a warrant, consent, or a further exigency was only required for an "additional investigation begun after *the fire has been extinguished and fire and police officials have left the scene."* 464 U.S. at 293, 104 S.Ct. at 647, 78 L.Ed.2d at 484. (Emphasis added). The focus is whether the *official presence* was continuous and whether the duration of the search was reasonable, not whether particular individuals were continuously present at the scene of the fire. Here, Officer Egan and Fire Marshal Lucas began the challenged search while fire fighters were still at the scene of the fire conducting standard overhaul activities. The entire fire investigation lasted approximately three hours. We find that the facts of this case do not trigger application of the three prong test for "continuation" searches set forth in *Michigan v. Clifford, supra,* and applied by our Supreme Court in *Commonwealth v. Smith, supra.* The challenged search commenced before the official presence at the fire scene had terminated; as the duration of that presence was not unreasonable, we do not read *Tyler, Clifford,* or *Smith* to require further analysis.

In light of the foregoing, we find no reason to disturb the trial court's ruling that the warrantless investigation was reasonable under the standards set forth in *Tyler* and *Clifford*.[3]

## II. HOSPITAL STATEMENTS

Appellant contends that his statements at the hospital should have been suppressed as the fruit of an unconstitutional interrogation. He argues that the questioning was custodial in that he was questioned by police when he was confined by circumstances beyond his control. Appellant cites in support of this contention *Commonwealth v. Chacko*, 500 Pa. 571, 459 A.2d 311 (1983), *Commonwealth v. D'Nicuola*, 448 Pa. 54, 292 A.2d 333 (1972) and *Commonwealth v. Bordner*, 432 Pa. 405, 247 A.2d 612 (1968). We find no merit in this contention.

**3.** Courts of our sister states have reached the same conclusion in similar cases. In *State v. Moretti*, 521 A.2d 1003 (R.I.1987), the Rhode Island Supreme Court rejected a claim that a warrantless fire investigation search was unreasonable because the fire inspector had not arrived at the fire scene until after the fire was extinguished and the firemen had begun overhaul efforts. Likewise, in *State v. Jorgensen*, 333 N.W.2d 725 (S.D.1983), the Supreme Court of South Dakota rejected a claim that a warrantless fire investigation search was unreasonable when the Fire Chief and a Deputy State Fire Marshal arrived at the scene after the fire had been extinguished. *Accord Shultz v. State*, 593 P.2d 640 (1979). We also note *Davis v. State*, 178 Ga.App. 760, 344 S.E.2d 730 (1986), wherein the Court of Appeals of Georgia held that a warrantless fire investigation search was reasonable when the fire was discovered at 11:00 p.m., extinguished by approximately 2:00 a.m., and two firemen remained at the site to check for hot spots until 7:00 a.m., when the assistant fire chief and state inspectors arrived to conduct the fire investigation search. The court explained:

Keeping the two firemen at the scene was prudent and we do not find the duration of their vigil (approximately five hours) to have been unreasonable. Thus, because the authorized official entry had not terminated before the assistant fire chief returned, the appellant's reasonable expectations of privacy did not extend to the warrantless investigation of the cause of the fire and collection of samples from the house.

344 S.E.2d at 732. The intrusion upon privacy interests in the present case was of a substantially shorter duration than that approved in *Davis*.

## A.

*Miranda* warnings are only required prior to custodial interrogations. *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694, 706 (1966); *see also Berkemer v. McCarty*, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984); *California v. Beheler*, 463 U.S. 1121, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983); *Roberts v. United States*, 445 U.S. 552, 100 S.Ct. 1358, 63 L.Ed.2d 622 (1980); *Oregon v. Mathiason*, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977); *Beckwith v. United States*, 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976).

"[T]he right of silence described in those warnings derives from the Fifth Amendment and adds nothing to it. Although *Miranda*'s requirement of specific warnings creates a limited exception to the rule that privileges must be claimed, the exception does not apply outside the context of the inherently coercive custodial interrogations for which it was formed." *Roberts v. United States, supra*, 445 U.S. at 560, 100 S.Ct. at 1364, 63 L.Ed.2d at 631. "The sole concern of the Fifth Amendment, on which *Miranda* was based, is governmental coercion. Indeed, the Fifth Amendment privilege is not concerned 'with moral and psychological pressures to confess emanating from sources other than official coercion.'" *Colorado v. Connelly*, 479 U.S. 157, 169, 107 S.Ct. 515, 523, 93 L.Ed.2d 473, 486 (1986).

The Supreme Court explained in *Beckwith v. United States, supra*, that:

The narrow issue before the Court in Miranda was presented very precisely in the opening paragraph of that opinion—'the admissibility of statements obtained from an individual who is subjected to *custodial* police interrogation.' The Court concluded that compulsion is 'inherent in custodial surroundings,' and, consequently, that special safeguards were required in the case of 'incommunicado interrogations of individuals in a police dominated atmosphere, resulting in self-incriminating statements without full warnings of constitutional rights.' In subsequent decisions, the Court specifically stressed that it was the

*custodial* nature of the interrogation which triggered the necessity for adherence to the specific requirements of its *Miranda* holding.

425 U.S. at 345–46, 96 S.Ct. at 1615–16, 48 L.Ed.2d at 7. (Emphasis in original, citations omitted).[4]

*Miranda* and subsequent cases explained that, "[b]y custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom in any significant way." *Miranda v. Arizona, supra,* 384 U.S. at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 706; *California v. Beheler, supra,* 463 U.S. at 1123, 103 S.Ct. at 3519, 77 L.Ed.2d at 1278; *Oregon v. Mathiason, supra,* 429 U.S. at 494, 97 S.Ct. at 713, 50 L.Ed.2d at 719.

The meaning of the phrase "or otherwise deprived of his freedom in any significant way," was unclear until the Supreme Court's decision in *Berkemer v. McCarty, supra,* wherein the Court explained:

Petitioner contends that a holding that every detained motorist must be advised of his rights before being questioned would constitute an unwarranted extension of the *Miranda* doctrine.

\* \* \* \* \* \*

*It must be acknowledged at the outset that a traffic stop significantly curtails the 'freedom of action' of the driver and the passengers, if any, of the detained vehicle.*

\* \* \* \* \* \*

*However, we decline to accord talismanic power to the phrase in the Miranda opinion emphasized by respondent [i.e. "or otherwise deprived of his freedom in any*

**4.** The Court quoted with approval the observation of Chief Judge Lumbard of the Second Circuit Court of Appeals that, "it was the compulsive aspect of custodial interrogation, and not the strength or content of the government's suspicions at the time the questioning was conducted, which led the court to impose the *Miranda* requirements with regard to custodial questioning." *Id.,* 425 U.S. at 346–47, 96 S.Ct. at 1616–17, 48 L.Ed.2d at 7–8, *quoting United States v. Carello,* 420 F.2d 471, 473 (2d Cir.1969).

significant way"]. *Fidelity to the doctrine announced in Miranda requires that it be enforced strictly, but only in those types of situations in which the concerns that powered the decision are implicated.* Thus, we must determine whether a traffic stop exerts upon a detained person *pressures that sufficiently impair his free exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights.*

468 U.S. at 436–37, 104 S.Ct. at 3148–49, 82 L.Ed.2d at 332–33. (Emphasis added).

It has been suggested that *Berkemer* affords "a measure of flexibility in deciding exactly when a suspect has been taken into custody." *Commonwealth v. Bruder*, 365 Pa. Super. 106, 111, 528 A.2d 1385, 1387 (1987). This is true. However, while the *Berkemer* holding is certainly flexible, it does not leave us without guidance. The Court in *Berkemer* explained further:

*[T]he usual traffic stop is more analogous to a so-called 'Terry stop,' than to a formal arrest.* Under the Fourth Amendment, we have held, a policeman who lacks probable cause but whose 'observations lead him reasonably to suspect' that a particular person has committed, is committing, or is about to commit a crime, may detain that person briefly in order to 'investigate the circumstances that provoke suspicion.' '[T]he stop and inquiry must be "reasonably related in scope to the justification for their initiation." ' Typically, this means that the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions. But the detainee is not obliged to respond. And, unless the detainee's answers provide the officer with probable cause to arrest him, he must then be released. *The comparatively nonthreatening character of detentions of this sort explains the absence of any suggestion in our opinions that Terry stops are subject to the dictates of Miranda. The similarly noncoercive aspect of ordi-*

*nary traffic stops prompts us to hold that persons temporarily detained pursuant to such stops are not 'in custody' for the purposes of Miranda.*

Respondent contends that to 'exempt' traffic stops from the coverage of *Miranda* will open the way to widespread abuse. Policemen will simply delay formally arresting detained motorists, and will subject them to *sustained and intimidating interrogation* at the scene of their initial detention.

\* \* \* \* \* \*

We are confident that the state of affairs projected by respondent will not come to pass. It is settled that the safeguards prescribed by *Miranda* become applicable *as soon as a suspect's freedom of action is curtailed to a 'degree associated with formal arrest.'* If a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him 'in custody' for practical purposes, he will be entitled to the full panoply of protections prescribed by *Miranda.*

468 U.S. at 439–40, 104 S.Ct. at 3150, 82 L.Ed.2d at 334–35. (Emphasis added, citations omitted); *cf. Commonwealth v. Gonzalez,* 519 Pa. 116, 546 A.2d 26, 29–30 (1988) (applying *Berkemer* and concluding that the appellant was not in "custody" despite his statutory duty to remain at the scene of the accident when he was not formally arrested but was merely asked a minimal number of questions at the scene of an accident on a public street).

The clear import of *Berkemer* is that traffic stops, like *Terry* stops, constitute *investigative* rather than *custodial* detentions, unless under the totality of circumstances the conditions and duration of the detention become the functional equivalent of an arrest. *See Commonwealth v. Douglass,* 372 Pa.Super. 227, 244, 539 A.2d 412, 421 (1988) (*per* Kelly, J.; Wieand and Popovich, JJ., concur in the result). The question in the instant case, then, is whether appellant's encounter with the police was custodial or non-custodial.

■ Encounters with police may be classified as mere encounters, non-custodial detentions,[5] custodial detentions and formal arrests. *See Commonwealth v. Douglass, supra*, 372 Pa.Superior Ct. at 238, 539 A.2d at 417; *see generally* Lafave, *Classifying Detentions of the Person to Resolve Warrant Grounds and Search Issues*, 17 U.Mich.J. L.Ref. 417, 417–38 (1984); McGinley, *Characterizing Police Encounters Under the Fourth Amendment: Inquiry, Stop, Arrest?* 10 Search & Seizure L.Rptr. 157, 157–64 (1988); Williamson, *The Dimensions of Seizure: The Concepts of "Stop" and "Arrest,"* 43 Ohio St.L.J. 771, 771–818 (1982). The classification of the encounter determines the applicability and scope of constitutional protections, including *Miranda* rights.

■ A "mere encounter" is one which does not involve a seizure of the person. A seizure of a person sufficient to trigger the protections of the Fourth Amendment occurs "only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed he was not free to leave." *Michigan v. Chesternut*, 486 U.S. ——, ——, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565, 572 (1988); *see also INS v. Delgado*, 466 U.S. 210, 215, 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247, 254 (1984); *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497, 508 (1980) (plurality).

■ It is important to note, however, that while a "seizure" of a suspect by police triggers Fourth Amendment protections, it does not trigger *Miranda* rights under the Fifth Amendment. "Seizure" and "custody" are analytically distinct concepts in the modern criminal constitutional law lexicon. The mere fact that an individual is subjected to a stop and a period of detention during which the individual is subject to the control of the police and is not free to leave (a seizure) does not render such detention necessarily "custodial" so as to require *Miranda* warnings.

5. Such encounters with police are also commonly referred to as *Terry* stops, traffic stops, investigatory detentions and intermediate detentions.

"While a suspect may certainly walk away from a mere encounter with a police officer, every traffic stop and every *Terry* stop involves a stop and a period of time during which the suspect is not free to go but is subject to the control of the police officer detaining him." *Commonwealth v. Douglass, supra,* 372 Pa.Superior Ct. at 242, 539 A.2d at 419. *See also Berkemer v. McCarty, supra,* 468 U.S. at 439–40, 104 S.Ct. at 3150, 82 L.Ed.2d at 334–35 (though a "traffic stop significantly curtails the freedom of action of the driver and the passengers, if any, of the detained vehicle," "the non-coercive aspect of ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to such stops are not 'in custody,' " unless the suspect "thereafter is subjected to treatment that renders him 'in custody' for practical purposes"); *Michigan v. Long,* 463 U.S. 1032, 1051, 103 S.Ct. 3469, 3482, 77 L.Ed.2d 1201, 1221 (1984) ("[d]uring any investigative detention, the suspect is 'in the control' of the officers in the sense that he 'may be briefly detained against his will....' "); *Commonwealth v. White, supra,* 358 Pa.Superior Ct. at 131, 516 A.2d at 1217 ("every *Terry* stop involves both a stop and a period of detention during which the suspect is not free to leave but is subject to the control of the police officer").

Though both *Terry* and *Berkemer* involved brief detentions, it is important to recall that:

> In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the [suspect]. A court making this assessment should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second guessing.

*Commonwealth v. White, supra,* 358 Pa.Superior Ct. at 128, 516 A.2d at 1215, *quoting Commonwealth v. Mayo,* 344 Pa.Super. 336, 341–42, 496 A.2d 824, 826 (1985), *quoting*

*United States v. Sharpe*, 470 U.S. 675, 686, 105 S.Ct. 1568, 1575–76, 84 L.Ed.2d 605, 615–16 (1985) (rejecting *per se* time limits).[6]

■ Indeed, police detentions only become "custodial" when under the totality of circumstances the conditions and/or duration of the detention become so coercive as to constitute the functional equivalent of formal arrest. *See Commonwealth v. Douglass, supra,* 372 Pa.Superior Ct. at 239, 539 A.2d at 418; *see also California v. Beheler, supra,* 463 U.S. at 1125, 103 S.Ct. at 3520, 77 L.Ed.2d at 1279 *(per curiam, Miranda* applies when suspect is restrained to a degree associated with formal arrest); *Dunaway v. New York, supra,* 442 U.S. at 212, 99 S.Ct. at 2256, 60 L.Ed.2d at 835–36 (seizing, transporting, and then questioning a suspect at a police station was custodial as it was "in important respects indistinguishable from a traditional arrest"); *Oregon v. Mathiason, supra,* 429 U.S. at 495, 97 S.Ct. at 714, 50 L.Ed.2d at 719 (suspect who voluntarily accompanied police to stationhouse for questioning was not "in custody" where degree of restraint was not equivalent to that associated with formal arrest); *Commonwealth v. Gonzalez, supra,* 519 Pa. at 124, 546 A.2d at 30 ("appellant was not under arrest and he has not shown that he was subjected to restraints comparable to those associated with formal arrest").

■ Among the factors which may be considered in determining whether a detention is custodial are: the basis for the detention (the crime suspected and the grounds for

---

**6.** *Accord United States v. Montoya De Hernandez,* 473 U.S. 531, 542, 105 S.Ct. 3304, 3311, 87 L.Ed.2d 381, 392 (1985) (applying *Sharpe;* again rejecting *per se* time limits; and, holding that a 16 hour detention was reasonable under the circumstances of that case); *Michigan v. Summers,* 452 U.S. 692, 702 & n. 12, 101 S.Ct. 2587, 2593 & n. 12, 69 L.Ed.2d 340, 348 & n. 12 (1981) (noting that "[i]f purpose underlying a *Terry* stop—investigating possible criminal activity—is to be served, the police must under certain circumstances be able to detain the individual for longer than the brief time period involved in *Terry* and *Adams* "); *Commonwealth v. Douglass, supra,* 372 Pa.Superior Ct. at 245–246, 539 A.2d at 421–22 (classifying a three hour detention as a reasonable investigative detention under the circumstances of that case).

suspicion); the duration of the detention; the location of the detention (public or private); whether the suspect was transported against his will (how far, why); the method of the detention (restraints utilized); the show, threat or use of force; and the investigative methods used to confirm or dispel suspicions. *Commonwealth v. Douglass, supra,* 372 Pa.Superior Ct. at 245, 539 A.2d at 421, *citing* 3 *LaFave, Search and Seizure,* §§ 9.1, 9.2 at 332–422 (2d Ed.1987); *see also LaFave, supra,* 17 U.Mich.J.L.Ref. at 417–38; McGinley, *supra,* 10 Search & Seizure L.Rptr. at 157–64; Williamson, *supra,* 43 Ohio St.L.J. at 771–818.

Examples of "totality of the circumstances" reviews may be found in *Commonwealth v. Gonzalez, supra,* 519 Pa. at 124–126, 546 A.2d at 30, *Commonwealth v. Douglass, supra,* 372 Pa.Superior Ct. at 245–247, 539 A.2d at 421–23, *Commonwealth v. Fento,* 363 Pa.Super. 488, 498–99, 526 A.2d 784, 786–89 (1987), *Commonwealth v. Grove,* 363 Pa.Super. 328, 340–41 & n. 7, 526 A.2d 369, 375–76 & n. 7 (1987), and *Commonwealth v. White, supra,* 358 Pa.Superior Ct. at 131, 516 A.2d at 1217. These cases, and the federal cases previously cited, indicate that a review of several if not all of the factors noted above will ordinarily be required (rather than focusing on factors such as the time or location of the detention to the exclusion of other factors). We note, however, that the Supreme Court cautioned in *California v. Beheler, supra,* that:

> Although the circumstances of each case must certainly influence a determination of whether a suspect is 'in custody' for purposes of receiving *Miranda* protection, *the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest.*

463 U.S. at 1125, 103 S.Ct. at 3520, 77 L.Ed.2d at 1279. (Emphasis added).

The instant case is in its material aspects indistinguishable from *Commonwealth v. Fento, supra,* wherein this Court held that a driver receiving emergency room treatment for injuries received in an automobile accident

was not subjected to a custodial interrogation requiring the *Miranda* warnings when he was questioned briefly in a hospital emergency room by a police officer investigating the automobile accident, despite the confinement of the suspect to his hospital bed due to his injuries. As in *Fento*, appellant here was questioned in an open area of the hospital emergency ward in view of hospital personnel. The questioning was brief and related to the occurrence which caused the injuries being treated. Appellant was not placed under arrest before, during, or after the questioning. The only restraints upon appellant's freedom were those caused by his medical condition, as opposed to any action on the part of the police.[7] We conclude, therefore, that appellant was not "in custody" and that the *Miranda* warnings were not required. *Cf. Commonwealth v. Gonzalez, supra* (similar questioning of a driver at the scene of an accident); *accord State v. Clappes*, 117 Wisc. 277, 344 N.W.2d 141 (1984); *State v. Fields*, 294 N.W.2d 404 (N.D.1980); *State v. Brunner*, 211 Kan. 596, 507 P.2d 233 (1973).

The cases cited by appellant do not support the conclusions appellant urges. *Commonwealth v. Chacko, supra*, cited by appellant, involved police questioning of a defendant who was *incarcerated* on unrelated charges; thus, *Chacko* is factually distinguishable in material respects regarding the issue of custody and is therefore inapposite. *Commonwealth v. D'Nicuola, supra,* and *Commonwealth v. Bordner, supra,* also cited by appellant, are not control-

7. Officer Egan candidly admitted that he had asked the dispatcher to have an officer sent to detain the witnesses until he arrived. However, both Officer Patchell and Officer Hunger unequivocally denied speaking to either witness or in any way restraining their freedom of movement. The trial court apparently credited their testimony. We note that Officer Egan's unexecuted and uncommunicated intent to have appellant detained is not relevant to our determination of whether appellant was in custody. "[T]he subjective intent of the officers is relevant to an assessment of the Fourth Amendment implications of police conduct only to the extent that the intent has been conveyed to the person confronted." *Michigan v. Chesternut, supra,* 486 U.S. at —— n. 7, 108 S.Ct. at 1980 n. 7, 100 L.Ed.2d at 573 n. 7 (1988), *citing United States v. Mendenhall, supra,* 446 U.S. at 554 n. 6, 100 S.Ct. at 1877 n. 6, 64 L.Ed.2d at 509 n. 6, *and 3 LaFave, Search and Seizure,* § 9.2(h) at 407 (2d ed. 1987).

ling because they were both decided under the "focus of the investigation" analysis subsequently disapproved by the United States Supreme Court in *Beckwith v. United States, supra.* *See Commonwealth v. Fento, supra,* 363 Pa.Superior Ct. at 496, 526 A.2d at 788 (analyzing and distinguishing *D'Nicuola* and other similar cases). Consequently, we find no merit in appellant's contention that his statements at the hospital should have been suppressed.

## III. PRIOR CONVICTION IMPEACHMENT EVIDENCE

▇▇▇ Appellant next contends that the trial court erred in permitting the use of his six year old convictions for theft and receiving stolen property to impeach his credibility. As the convictions were less than ten years old and involved *crimen falsi* offenses, this contention is wholly without merit. *See Commonwealth v. Randall,* 515 Pa. 410, 528 A.2d 1326 (1987).

## IV. SUFFICIENCY AND WEIGHT OF THE EVIDENCE

▇▇▇ Finally, appellant contends that the evidence is not sufficient to sustain the convictions, or in the alternative that the verdicts were against the weight of the evidence. Appellant argues that reasonable inferences derivable from the testimony of Commonwealth witnesses and certain physical evidence established that appellant could not have poured the gasoline and lit the fire. Appellant also argues that there was no evidence to sustain the reckless endangerment conviction.

This Court explained in *Commonwealth v. Pearsall,* 368 Pa.Super. 327, 534 A.2d 106 (1987), that:

In reviewing the sufficiency of the evidence to support a conviction, the evidence must be viewed in the light most favorable to the *Commonwealth,* and the *Commonwealth* is entitled to all favorable inferences which may be drawn from the evidence. Where the evidence is conflicting, it is the province of the fact finder to deter-

mine credibility; it is the prerogative of the fact finder to believe all, part or none of the evidence presented. Whether a new trial should be granted because the verdict is against the weight of the evidence is an issue addressed to the sound discretion of the trial court; a new trial should be granted only when the verdict is so contrary to the evidence as to shock one's sense of justice.

368 Pa.Superior Ct. at 329–330, 534 A.2d at 108. (Citations omitted, emphasis added).

Appellant errs in viewing the evidence in the light most favorable to *appellant,* in resolving all conflicts in favor of *appellant,* and in drawing all inferences in favor of *appellant.* Viewed in its proper light (*i.e.* that most favorable to the *Commonwealth* ), the evidence is sufficient to sustain the verdict, and the verdict is not against the weight of the evidence.

Without proceeding to review the evidence here in minute detail, we note that: appellant owned and insured the mortgaged property; appellant was unquestionably present when the fire occurred; the evidence plainly established that the fire was started with the aid of a large amount of gasoline; yet, appellant informed the police shortly after the fire that no gasoline was in the kitchen and that the fire had started when the stove (which the fire investigators found to be without leak or defect) exploded. With respect to the endangerment offense, we note that both appellant and the other person present were severely burned in the fire, the fire occurred during a holiday time, near a busy intersection, and appellant risked a serious explosion by turning on the gas stove in an effort to cloak the use of gasoline as a flame accelerant. We find no reason to disturb the verdicts of the jury, or the order of the trial court denying appellant a new trial.

## CONCLUSION

Based upon the foregoing, judgment of sentence is affirmed.