**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| LEON PLATT, | : | |
| APPELLANT | : | |
| | : | |
| | : | No. 1326 WDA 2016 |

Appeal from the Judgment of Sentence August 3, 2016
In the Court of Common Pleas of Lawrence County
Criminal Division at No(s): CP-37-CR-0001434-2013

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| LEON PLATT, | : | |
| APPELLANT | : | |
| | : | |
| | : | No. 1327 WDA 2016 |

Appeal from the Judgment of Sentence August 3, 2016
In the Court of Common Pleas of Lawrence County
Criminal Division at No(s): CP-37-CR-0001432-2013

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| LEON PLATT, | : | |
| APPELLANT | : | |
| | : | |
| | : | No. 1328 WDA 2016 |

Appeal from the Judgment of Sentence August 3, 2016
In the Court of Common Pleas of Lawrence County
Criminal Division at No(s): CP-37-CR-0001417-2013

J. S21027/17

BEFORE: LAZARUS, J., DUBOW, J., and STRASSBURGER, J.[*]

MEMORANDUM BY DUBOW, J.:                        **FILED APRIL 13, 2017**

Appellant, Leon Platt, appeals from the Judgment of Sentence entered in the Lawrence County Court of Common Pleas in these consolidated appeals following his conviction at Case No. 1434 of Murder of the Third Degree, Recklessly Endangering Another Person ("REAP"), Persons not to Possess or Use Firearms, and Firearms not to Be Carried without a License,[1] at Case No. 1417 of Discharge of a Firearm into an Occupied Structure;[2] and at Case No. 1432 of Criminal Mischief and REAP.[3]  We affirm.

We summarize the facts as follows.  On November 11, 2013, Appellant and Taylor Foley ("Foley") went to the home of Michael Pounds, with whom Foley and Appellant had an ongoing dispute.  Foley drove the two to Mr. Pounds' home in a white Chevrolet Cruz owned by Foley's mother.  Appellant fired shots toward and into the side of the house.  The bullets did not pass through to the interior of the home, but at least some bullets stuck in the house.  Police found four .45 caliber shell casings around Pounds' home.

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. § 2502(c), 18 Pa.C.S. § 2705, 18 Pa.C.S. § 6105(a)(1), and 18 Pa.C.S. § 6106(a)(1), respectively.

[2] 18 Pa.C.S. § 2707.1(a).

[3] 18 Pa.C.S. § 3304(a) and 18 Pa.C.S. § 2705, respectively.

On the evening of November 15, 2013, Appellant, Foley, Foley's infant child, LaXavier Crumb ("Crumb"), Heather Hall ("Hall"), and Shane Mihalko ("Mihalko") were at Hall and Crumb's apartment at 411 Loop Street. That night, Appellant, Foley, Crumb, and Richard Hogue (the "Victim") left 411 Loop Street and drove to the West End Café.

The group drove to a road behind the West End Café, and Appellant and Foley exited the vehicle. Foley shot her 9 mm pistol and Appellant shot his .45 caliber Kimber pistol near the West End Café, hitting the car of Linda Boots and going through the window of Tim and Allison Phillippi's residence at 1217 Lawrence Ave.[4] Crumb and the Victim stayed in the car.[5]

Following the shooting, Appellant, Crumb, Foley, and the Victim returned to 411 Loop Street. Foley and the Victim left to get cigarettes and, while they were out, checked to see the damage Appellant and Foley had caused by the shooting at the West End Café.

Upon their return to 411 Loop Street, an argument between the Victim and Appellant about the scope of the damage caused by Appellant and Foley ensued.

---

[4] Both Tim and Allison Phillippi were present in the living room when the bullets went through the living room window.

[5] After investigating the scene, police found five empty .45 caliber casings and two empty 9 mm casings near Linda Boots' Jeep, and a bullet hole in its passenger side door. Police also found two bullet holes in the window of the Phillippi residence and one bullet fragment, which police determined to have come from Lawrence Avenue.

Appellant was on one side of the room in a rocking chair, Foley and her baby were on a loveseat adjacent to the chair. The Victim was in the middle of a couch across the room from Appellant with Crumb to his left and Mihalko to his right, and a coffee table in the middle of the seating arrangement. As the argument got more intense, Mihalko, sensing trouble, left the house. The argument continued and both the Victim and Appellant stood up across the living room from each other. Foley then covered her baby in a protective position, Appellant raised his .45 caliber Kimber pistol and shot the Victim once. The Victim later died.

After Appellant shot the Victim, Appellant, Crumb, and Hall all left 411 Loop Street. Foley stayed at the house with the Victim and called 911. When the police arrived, they spoke with Foley who eventually told them that Appellant was the shooter and gave them a description of him. Appellant, who was allegedly at Foley's parents' residence, called Foley.[6]

After being called to Elwood City to investigate the shooting, Sgt. Matthew Smock, of nearby Koppel Borough, observed Appellant heading away from Elwood City. Upon the arrest, Appellant identified himself as "Mike." The Koppel Borough officers exchanged custody of Appellant with the Pennsylvania State Police, who transported him to the Elwood City Police Department.

---

[6] Police conducted a protective sweep of the Foley residence, but did not find Appellant.

On November 16, 2013, the Commonwealth charged Appellant with the above crimes.

On December 17, 2013, the court held a preliminary hearing at which Appellant entered not guilty pleas to all charges. On June 11, 2014, Appellant filed an Omnibus Pretrial Motion for Suppression and Writ of *Habeas Corpus*. After hearings on the Motion, the court denied the Motion.

The case proceeded to trial on April 4, 2016. On April 14, 2016, a jury convicted Appellant of the above charges. On August 3, 2016, the court sentenced Appellant to an aggregate term of 22 to 52 years' incarceration. Appellant did not file a Post-Sentence Motion. Rather, on September 1, 2016, Appellant filed a Notice of Appeal to this Court. Both Appellant and the trial court complied with Pa.R.A.P. 1925.

Appellant raises the following three issues on appeal:

> 1. Whether the prosecuting attorney committed misconduct when arguing in closing argument facts not placed into evidence?
>
> 2. Whether the court erred in failing to suppress [Appellant's] statements made to Trooper Douglas Price and Officer Brian Damon?
>
> 3. Whether the verdict was against the weight of the evidence to convict for third degree murder?

Appellant's Brief at 21.

In his first issue, Appellant claims that the trial court erred in allowing the district attorney to commit misconduct by referring to facts not in evidence during his closing argument. *Id.* at 29. Appellant argues that the

- 5 -

trial court erred in overruling Appellant's objection to the Commonwealth's statement in its closing argument that the Victim flinched or attempted to move out of the way of the gun's line of fire—a fact that Appellant claims is unsupported by the facts of record. *Id.* at 35. Appellant avers that the Commonwealth intentionally made this unsupported statement to undermine Appellant's defense that it was Crumb, and not the Appellant, who shot the Victim. *Id*. at 29, 34. Appellant argues that the inference that the Victim flinched was unreasonable in light of Crumb's testimony that the Victim was "not letting his guard down"[7] while staring down the barrel of the Victim's gun. Specifically Appellant argues as follows:

> The sole purpose of the prosecutor's extensive description of [the Victim's] movement was to somehow explain away the angle and direction of the shot. Based on the physical evidence of the internal path of the bullet by Dr. [Luckasevic] and the testimony of both Foley and Crumb[,] the shot could not have come from the location in which [A]ppellant was standing. The path and direction of the bullet was the most crucial piece of evidence for the defense and the prosecutor took that away from both the defense and the jury when he made up evidence that he could not produce at trial.

*Id.* at 34.

When delivering a closing argument, a prosecutor must limit his statements to the facts introduced at trial and the legitimate inferences therefrom. *Commonwealth v. Stafford*, 749 A.2d 489, 499 (Pa. Super. 2000). The Commonwealth is free to argue that the evidence adduced at

---

[7] N.T., 4/5/16, at 134-35.

trial leads to guilt and is permitted to suggest all favorable and reasonable inferences arising from that evidence. ***Id.***

The following guides our review of a claim of prosecutorial misconduct:

> Our standard of review for a claim of prosecutorial misconduct is limited to whether the trial court abused its discretion.
>
>> In considering this claim, our attention is focused on whether the defendant was deprived of a fair trial, not a perfect one.
>>
>> Generally, a prosecutor's arguments to the jury are not a basis for the granting of a new trial unless the unavoidable effect of such comments would be to prejudice the jury, forming in their minds fixed bias and hostility towards the accused which would prevent them from properly weighing the evidence and rendering a true verdict.
>
> A prosecutor must have reasonable latitude in fairly presenting a case to the jury and must be free to present his or her arguments with logical force and vigor. The prosecutor is also permitted to respond to defense arguments. Finally, in order to evaluate whether the comments were improper, we do not look at the comments in a vacuum; rather we must look at them in the context in which they were made.

***Commonwealth v. Rolan***, 964 A.2d 398, 410 (Pa. Super. 2008) (citations omitted).

The trial court found that, notwithstanding Crumb's testimony that the Victim was holding his ground and not letting down his guard when threatened with Appellant's gun, the prosecutor's statement was based on reasonable inferences from the testimony of Dr. Todd Luckasevic, an expert forensic pathologist at trial, and witness Taylor Foley. We agree.

Dr. Luckasevic had performed an autopsy on the Victim and testified to the particulars of the point of entry of the fatal bullet, the course it traveled, and its placement in the Victim's body. N.T., 4/5/16, at 90-92. He testified that, "once the bullet hit the skin, it travelled from front to back, left to right and downward." *Id.* at 91-92. He explained that the placement of the bullet is relative to the "standard anatomic position," which he described as "standing straight up, facing forward, arms at your side with palms facing out." *Id.* at 92.

Taylor Foley also testified at Appellant's trial. She testified that Appellant and the Victim were on opposite sides of the room from each other, standing, and were arguing when Appellant loaded the firearm, aimed it at the Victim, and slowly lowered it from shoulder height, approximately 8 or 9 inches. N.T., 4/8//16, at 43-44. Then the gun fired. *Id.* at 48. Ms. Foley also testified that LaXavier Crumb was to the Victim's left side when the shot was fired into the Victim's abdomen. *Id.* at 46. Foley denied seeing who discharged the gun. *Id.* at 48.

At trial, the district attorney made the following statement in his closing argument:

> While the pathologist told us the anatomical position, the normal anatomical position is what he references that gunshot by, he didn't say that [Appellant] or whoever shot Richard Hogue was shooting him from a normal anatomic position, and I'd suggest to you that no one was standing there in this manner, in what pathologists call a normal anatomic position, for that shot to be fired.

What's really happening? The defendant takes out the gun across the distance, but less than this of the coffee table. Hogue is there with Laxavier Crumb, good sized man to his left. To his right, there's at the end of the other couch and that table. As [Appellant] puts that gun on him, Richard Hogue is looking into the barrel of that .45 and he flinches in the only quick way to get out of there. He flinches to his right.

Taylor [Foley] told about the gun dropping, the aim dropping, and that's what you're seeing. Hogue is up. Hogue sees the barrel and he starts to go to the open way, down to his corner, behind the corner of that couch.

But then we hear about the bullet coming in [from Dr. Luckasevic]. The bullet came in about belly button high, three inches to the left. It also had the abrasion in the 1 o'clock position. That would be just a little to the left , but we know that that was – the bullet was coming down in this direction. It wasn't the normal anatomic position, it was the flinch. When he dropped to get out of the line of that gun, he put himself in a position to receive that shot.

N.T., 4/13/16, at 55-56.

Appellant objected to that statement on the basis that, "[t]here's no evidence that he moved. The testimony is that he was standing directly in front of him." *Id.* at 56. The Commonwealth explained that the statement is "within the range of argument[,]" and the court overruled Appellant's objection.

The trial court explained its decision to permit the district attorney to refer to the victim as flinching or moving into a position to "receive that shot" as follows:

Reasonable inferences of these pieces of evidence would include that the Victim and [Appellant] were facing each other, and[,] for the bullet to have entered as described by

> the [f]orensic [p]athologist Victim would have had to have changed his position. This is the argument presented by the Commonwealth during closing. Based on these reasonable inferences, this [c]ourt properly held the statements of the Commonwealth to be within the scope of argument and overruled the objection.

Trial Ct. Op., 10/24/16, at 6.

Our review of the Notes of Testimony confirms that the trial court appropriately determined that it was reasonable to infer from the testimony of Dr. Luckasevic and Ms. Foley that the victim may have moved just before Appellant shot him. Because the district attorney based his statement on reasonable inferences from evidence of record, and the Commonwealth is permitted to suggest to the jury all favorable and reasonable inferences that arise from the evidence, the trial court did not abuse its discretion in concluding that he did not engage in misconduct. Accordingly, Appellant is not entitled to relief on this claim.

In his second issue, Appellant challenges the trial court's denial of his Motion to Suppress the statements he made to Trooper Douglas Price and Officer Brian Damon while in police custody. Appellant's Brief at 36-39. First, Appellant argues that the court erred in not suppressing statements he made to Trooper Price because Trooper Price improperly detained him and did not give him a *Miranda*[8] warning before questioning him. Appellant argues that, during the period when he was in Trooper Price's custody, any

---

[8] *Miranda v. Arizona*, 384 U.S. 436 (1966).

questions posed by police were in the nature of an interrogation and, therefore, the police were obliged to provide Appellant with a *Miranda* warning. *Id.* at 38. Appellant argues that, since Officer Price did not Mirandize Appellant, any statements made to police, including those following Officer Damon twice advising Appellant of his *Miranda* rights, were not knowing and voluntary and the court should have suppressed them. *Id.* at 39.

Our standard of review is well-settled:

> When reviewing the denial of a motion to suppress evidence, we examine "the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in context of the record as a whole." *Commonwealth v. Jones*, 605 Pa. 188, 988 A.2d 649, 654 (2010). We then determine "whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct." *Id.* Our review of the application of the law to the facts is plenary. *Id.*

*Commonwealth v. Washington*, 51 A.3d 895, 897 (Pa. Super. 2012).

The obligation of the police to inform a criminal defendant of his rights is well-settled:

> A law enforcement officer must administer *Miranda* warnings prior to custodial interrogation. *Commonwealth v. Johnson*, 373 Pa. Super. 312, 541 A.2d 332, 336 (1988). The standard for determining whether an encounter with the police is deemed "custodial" or police have initiated a custodial interrogation is an objective one based on a totality of the circumstances, with due consideration given to the reasonable impression conveyed to the person interrogated. *Commonwealth v. Gwynn*, 555 Pa. 86, –––, 723 A.2d 143, 148 (1998). Custodial interrogation has been defined as "questioning

initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his [or her] freedom of action in any significant way." ***Johnson***, 541 A.2d at 336 quoting ***Miranda***[, 384 U.S. at 444]. "Interrogation" is police conduct "calculated to, expected to, or likely to evoke admission." ***Id.*** quoting ***Commonwealth v. Simala***, 434 Pa. 219, 226, 252 A.2d 575, 578 (1969). When a person's inculpatory statement is not made in response to custodial interrogation, the statement is classified as gratuitous, and is not subject to suppression for lack of warnings. ***Id.***

The appropriate test for determining whether a situation involves custodial interrogation is as follows:

> The test for determining whether a suspect is being subjected to custodial interrogation so as to necessitate ***Miranda*** warnings is whether he is physically deprived of his freedom in any significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by such interrogation.

***Commonwealth v. Busch***, 713 A.2d 97, 100 (Pa. Super. 1998) quoting ***Commonwealth v. Rosario***, 438 Pa.Super. 241, 652 A.2d 354, 365–66 (1994) (*en banc*), *appeal denied*, 546 Pa. 668, 685 A.2d 547 (1996) (other citations omitted). Said another way, police detentions become custodial when, under the totality of the circumstances, the conditions and/or duration of the detention become so coercive as to constitute the functional equivalent of arrest. ***Commonwealth v. Ellis***, 379 Pa.Super. 337, 549 A.2d 1323, 1332 (1988), *appeal denied*, 522 Pa. 601, 562 A.2d 824 (1989), citing ***California v. Beheler***, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983).

The factors a court utilizes to determine, under the totality of the circumstances, whether a detention has become so coercive as to constitute the functional equivalent of arrest include: the basis for the detention; its length; its location; whether the suspect was transported against his or her will, how far, and why; whether restraints were used; whether the law enforcement officer showed, threatened

> or used force; and the investigative methods employed to confirm or dispel suspicions. ***Busch***, 713 A.2d at 101. The fact that a police investigation has focused on a particular individual does not automatically trigger "custody," thus requiring ***Miranda*** warnings. ***Commonwealth v. Fento***, 363 Pa.Super. 488, 526 A.2d 784, 787 (1987).

***Commonwealth v. Mannion***, 725 A.2d 196, 200 (Pa. Super. 1999).

With respect to the voluntariness of a defendant's statements to the police, we are guided by the following:

> The test for determining the voluntariness of a confession and whether an accused knowingly waived his or her rights looks to the totality of the circumstances surrounding the giving of the confession. Some of the factors to be considered include: the duration and means of interrogation; the accused's physical and psychological state; the conditions attendant to the detention; the attitude exhibited by the police during the interrogation; and any and all other factors which may serve to drain one's powers of resistance to suggestion and coercion.

***Commonwealth v. Jones***, 683 A.2d 1181, 1189 (Pa. 1996) (citations omitted).

The suppression court based its decision to deny Appellant's Motion to Suppress on the testimony of Trooper Doug Price and Officer Brian Damon. In denying Appellant's Motion to Suppress statements to Trooper Price the court considered Trooper Price's testimony that he

> patted down [Appellant] prior to putting him in the back of the patrol car and asked [Appellant] his name. [Appellant] responded that his name was Mike Williams. Trooper Price then asked [Appellant] where he was headed, and [Appellant] stated that he was headed home to Rochester. [Appellant] was transported to the Elwood City Police Stat[ion] and placed in a holding cell. Trooper Price again

> asked [Appellant] his name, and this time, [Appellant] responded Leon Platt.

Trial Ct. Op., 5/12/15, at 11-12, 6-7.

The suppression court concluded that "prior to a formal interrogation taking place, [Appellant] was asked his name and intended destination on two separate occasions." *Id.* at 14-15. We agree with the trial court that the questions posed to Appellant by Trooper Price did not constitute an interrogation. These two questions were of the most basic kind, and merely informational in nature, and were not "calculated to, expected to, or likely to evoke admission." ***Johnson***, ***supra*** at 336. Because the interaction between Trooper Price and Appellant was not an interrogation, Appellant was not entitled to a ***Miranda*** warning. The suppression court, therefore, did not err in denying Appellant's Motion to Suppress the statements he had made to Trooper Price.

Appellant predicates his claim that the court erred in not suppressing his statements to Officer Damon on Trooper Price's prior alleged ***Miranda*** violation. Because we have concluded that Trooper Price's questioning of Appellant was not an interrogation, and Trooper Price did not violate Appellant's ***Miranda*** rights, this claim necessarily fails. Moreover, as noted by the trial court "Officer Damon specifically testified to providing [Appellant] with his ***Miranda*** [rights] prior to commencing an interrogation at 7:00 a.m." Trial Ct. Op, 5/12/15, at 15. Our review of the Notes of Testimony confirms this factual finding. Appellant is, thus, not entitled to relief.

In his final claim, Appellant challenges the weight of the evidence. *See* Appellant's Brief at 39-40.

A challenge to the weight of the evidence must be preserved by a Post-Trial Motion.  Pa.R.Crim.P. 607 provides:

### Rule 607. Challenges to the Weight of the Evidence

(A) A claim that the verdict was against the weight of the evidence shall be raised with the trial judge in a motion for a new trial:

>    (1) orally, on the record, at any time before sentencing;

>    (2) by written motion at any time before sentencing; or

>    (3) in a post-sentence motion.

Pa.R.Crim.P. 607(A)(1)-(3).  "As noted in the comment to Rule 607, the purpose of this rule is to make it clear that a challenge to the weight of the evidence must be raised with the trial judge or it will be waived." ***Commonwealth v. Gillard***, 850 A.2d 1273, 1277 (Pa. Super. 2004) (quotation marks omitted). A claim challenging the weight of the evidence generally cannot be raised for the first time in a Rule 1925(b) statement. ***Commonwealth v. Burkett***, 830 A.2d 1034, 1037 (Pa. Super. 2003).  An appellant's failure to avail himself of any of the prescribed methods for presenting a weight of the evidence issue to the trial court constitutes waiver of that claim, even if the trial court responds to the claim in its Rule 1925(a) opinion. ***Id.***

Instantly, Appellant failed to challenge the weight of the evidence before the trial court in a motion for a new trial. *See* Pa.R.Crim.P. 607. Rather, Appellant raised his weight claim for the first time in his Rule 1925(b) statement. *See Burkett, supra*. Thus, his third issue on appeal is waived. *See* Pa.R.Crim.P. 607; *Gillard, supra*; *Burkett, supra*.

Judgments of Sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/13/2017