J-A04020-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| JON LEE, | |
| Appellant | No. 1264 WDA 2014 |

Appeal from the Judgment of Sentence Entered March 13, 2014
In the Court of Common Pleas of Allegheny County
Criminal Division at No(s): CP-02-CR-0010514-2012

BEFORE:  FORD ELLIOTT, P.J.E., BENDER, P.J.E., and SHOGAN, J.

MEMORANDUM BY BENDER, P.J.E.:                **FILED SEPTEMBER 7, 2016**

Appellant, Jon Lee, appeals from the judgment of sentence of 14-30 years' incarceration, imposed following his conviction for third-degree murder, robbery, and criminal conspiracy.  In this appeal, Appellant raises three claims for our review.  In our prior memorandum in this matter, we determined that Appellant's third claim was waived, and that his first two claims required us to remand to the trial court for a supplemental Pa.R.A.P. 1925(a) opinion.  ***See Commonwealth v. Lee***, No. 1264 WDA 2014, unpublished memorandum at 9 (Pa. Super. filed March 23, 2016).  The trial court has filed its supplemental Rule 1925(a) opinion, so we now address Appellant's remaining claims.  After careful review, we vacate Appellant's judgment of sentence on suppression grounds and remand for a new trial.

As we noted previously,

Appellant was charged, tried, and convicted for his role in the shooting death of Jordan Coyner, which occurred on June 18, 2012. Appellant, who was sixteen years old when Coyner was murdered, purportedly played the role of lookout in a robbery conspiracy that resulted in Coyner's death. This lethal scheme was concocted and executed by Appellant and his cohorts: Michael Shearn, Brandon Lind, Devele Reid, and Dmetrei McCann. The specific facts underlying this crime, and Appellant's role therein, are detailed in the trial court's Rule 1925(a) opinion, but are unnecessary to our disposition in the instant memorandum. *See* Trial Court Opinion (TCO), 2/26/15, at 7-17.

On August 24, 2012, Appellant was charged as an adult with criminal homicide generally (18 Pa.C.S. § 2501), robbery (18 Pa.C.S. § 3701), and criminal conspiracy (18 Pa.C.S. § 903). *See Commonwealth v. Sanders*, 814 A.2d 1248, 1250 (Pa. Super. 2003) ("Pursuant to 42 Pa.C.S.A. § 6322(a), when a juvenile has committed a crime, which includes murder, or any of the other offenses listed under paragraph (2)(ii) or (iii) of the definition of 'delinquent act' in 42 Pa.C.S.A. § 6302, the criminal division of the Court of Common Pleas is vested with jurisdiction."). On March 7, 2013, Appellant filed a petition to transfer his case to Juvenile Court, often called a decertification petition. *See id.* ("When a [juvenile's] case goes directly to criminal division, the juvenile has the option of requesting treatment within the juvenile system through a transfer process of 'decertification.'").

*Lee*, *supra*, at 1-2.

Following a decertification hearing held on May 28, 2013, the trial court denied Appellant's decertification petition. *See* Order, 6/27/13, at 1 (single page). Appellant also filed a motion to suppress his statement to police via an amended omnibus pre-trial motion filed on July 17, 2013.[1] The

---

[1] *See* footnote 11, *infra*, for a description of Appellant's inculpatory statement.

- 2 -

trial court denied the motion to suppress by order dated November 25, 2013.[2]

Appellant's first trial ended in a mistrial due to multiple issues with the empaneled jurors. *See* N.T., 12/3/13, at 91. His second trial was held on December 5-13, 2013. On December 13, 2013, the jury returned a verdict, finding Appellant not guilty of first- and second-degree murder, but guilty of third-degree murder, 18 Pa.C.S. § 2502(c), robbery, 18 Pa.C.S. § 3701(a)(i) (serious bodily injury), and criminal conspiracy, 18 Pa.C.S. § 903. Notably, the jury was instructed that the Commonwealth's theory of the case premised Appellant's culpability for third-degree murder exclusively on his role as an accomplice. *See* N.T., 12/5/13-12/13/13 (Vol. II), at 975-76.

On March 13, 2014, the trial court sentenced Appellant to 14-30 years' incarceration for third-degree murder, a concurrent term of 5-10 years' incarceration for robbery, and a concurrent term of 4-8 years' incarceration for conspiracy, for an aggregate term of 14-30 years' incarceration. On March 17, 2014, Appellant filed post-sentence motions, which were ultimately denied on July 2, 2014.

_____

[2] The Honorable Jeffrey A. Manning, President Judge of the Allegheny County Court of Common Pleas, presided over and ruled upon Appellant's pre-trial decertification and suppression claims. However, The Honorable Philip Anthony Ignelzi of the Allegheny County Court of Common Pleas presided over Appellant's trial.

Appellant filed a timely notice of appeal on August 1, 2014. Appellant filed a timely, court-ordered Pa.R.A.P. 1925(b) statement on October 27, 2014. Judge Ignelzi issued the trial court's Rule 1925(a) opinion on February 25, 2015. Appellant filed his brief on June 23, 2015, and the Commonwealth filed its brief on September 21, 2015. In a memorandum filed on March 23, 2016, this Court dismissed one of Appellant's three claims on waiver grounds, but remanded for President Judge Manning to file a supplemental Rule 1925(a) opinion regarding the remaining claims. The supplemental Rule 1925(a) opinion was issued on April 19, 2016.

Appellant presents the following questions for our review:

I.      DID THE LOWER COURT ERR IN FAILING TO SUPPRESS THE JUVENILE DEFENDANT'S STATEMENTS TO POLICE TAKEN IN CUSTODY, WITHOUT NOTIFYING THE DEFENDANT OF HIS RIGHT TO REMAIN SILENT AS REQUIRED BY *MIRANDA V. ARIZONA*,[3] AND WITHOUT ENSURING THAT THE JUVENILE DEFENDANT'S PARENTS WERE PRESENT DURING HIS QUESTIONING?

II.     DID THE LOWER COURT ABUSE ITS DISCRETION AND MISAPPLY 42 PA.C.S. § 6322 BY RETAINING CRIMINAL JURISDICTION OVER THE 16 YEAR-OLD DEFENDANT?

Appellant's Brief, at 6.[4]

_____

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[4] We have omitted Appellant's third claim, as it was addressed, and deemed waived, in our previous memorandum filed on March 23, 2016. *Lee*, *supra*, at 6-9.

- 4 -

Appellant's first claim concerns the trial court's denial of his motion to suppress his statement to police. Specifically, Appellant claims that the police violated his constitutional rights by failing to issue **Miranda** warnings, and by failing to ensure that his parents were present, when the police solicited an inculpatory statement from him at a police station. The Commonwealth argued at the suppression hearing, and continues to maintain, that Appellant was not a suspect, was not under arrest, and was not subject to an interrogation when he made that statement. Essentially, both parties agree that the critical inquiry is whether Appellant was 'in custody' for **Miranda** purposes at the time he made his inculpatory statement. If so, his statement was suppressible. The suppression court concluded that Appellant was not in custody at the time he made the statement.

> The standard of review an appellate court applies when considering an order denying a suppression motion is well established. An appellate court may consider only the Commonwealth's evidence and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. **Commonwealth v. Russo**, 594 Pa. 119, 934 A.2d 1199, 1203 (2007) (citing **Commonwealth v. Boczkowski**, 577 Pa. 421, 846 A.2d 75 (2004)). Where the record supports the factual findings of the trial court, the appellate court is bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error. **Id.** However, it is also well settled that an appellate court is not bound by the suppression court's conclusions of law. **Id.** (citing **Commonwealth v. Duncan**, 572 Pa. 438, 817 A.2d 455 (2003)).

> With respect to factual findings, we are mindful that it is the sole province of the suppression court to weigh the

credibility of the witnesses. Further, the suppression court judge is entitled to believe all, part or none of the evidence presented. However, where the factual determinations made by the suppression court are not supported by the evidence, we may reject those findings. Only factual findings which are supported by the record are binding upon this [C]ourt.

*Commonwealth v. Benton*, 440 Pa.Super. 441, 655 A.2d 1030, 1032 (1995) (citations omitted). … In appeals from suppression orders, our scope of review is limited to the evidence presented at the suppression hearing. *In the Interest of L.J.*, 622 Pa. 126, 79 A.3d 1073, 1088–1089 (2013).[1]

_____

[1] Our Supreme Court in *L.J.* clarified that the scope of review of orders granting or denying motions to suppress is limited to the evidence presented at the suppression hearing. The suppression hearing in this case post-dates *L.J.*, so *L.J.* is applicable here. *Commonwealth v. Davis*, 102 A.3d 996, 999 n.5 (Pa. Super. 2014).

*Commonwealth v. Caple*, 121 A.3d 511, 516-17 (Pa. Super. 2015).

A law enforcement officer must administer *Miranda* warnings prior to custodial interrogation. *Commonwealth v. Johnson*, 373 Pa. Super. 312, 541 A.2d 332, 336 (1988). The standard for determining whether an encounter with the police is deemed "custodial" or police have initiated a custodial interrogation is an objective one based on a totality of the circumstances, with due consideration given to the reasonable impression conveyed to the person interrogated. *Commonwealth v. Gwynn*, 555 Pa. 86, −−−−, 723 A.2d 143, 148 (1998). Custodial interrogation has been defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his [or her] freedom of action in any significant way." *Johnson*, 541 A.2d at 336 quoting *Miranda*[, 384 U.S. at 444]. "Interrogation" is police conduct "calculated to, expected to, or likely to evoke admission." *Id.* quoting *Commonwealth v. Simala*, 434 Pa. 219, 226, 252 A.2d 575, 578 (1969). When a person's inculpatory statement is not made in response to custodial interrogation, the statement is classified as gratuitous, and is not subject to suppression for lack of warnings. *Id.*

The appropriate test for determining whether a situation involves custodial interrogation is as follows:

> The test for determining whether a suspect is being subjected to custodial interrogation so as to necessitate *Miranda* warnings is whether he is physically deprived of his freedom in any significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by such interrogation.
>
> *Commonwealth v. Busch*, 713 A.2d 97, 100 (Pa. Super. 1998) quoting *Commonwealth v. Rosario*, 438 Pa.Super. 241, 652 A.2d 354, 365–66 (1994) (*en banc*), *appeal denied*, 546 Pa. 668, 685 A.2d 547 (1996) (other citations omitted). Said another way, police detentions become custodial when, under the totality of the circumstances, the conditions and/or duration of the detention become so coercive as to constitute the functional equivalent of arrest. *Commonwealth v. Ellis*, 379 Pa. Super. 337, 549 A.2d 1323, 1332 (1988), *appeal denied*, 522 Pa. 601, 562 A.2d 824 (1989), citing *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983).
>
> The factors a court utilizes to determine, under the totality of the circumstances, whether a detention has become so coercive as to constitute the functional equivalent of arrest include: the basis for the detention; its length; its location; whether the suspect was transported against his or her will, how far, and why; whether restraints were used; whether the law enforcement officer showed, threatened or used force; and the investigative methods employed to confirm or dispel suspicions. *Busch*, 713 A.2d at 101. The fact that a police investigation has focused on a particular individual does not automatically trigger "custody," thus requiring *Miranda* warnings. *Commonwealth v. Fento*, 363 Pa.Super. 488, 526 A.2d 784, 787 (1987).

*Commonwealth v. Mannion*, 725 A.2d 196, 200 (Pa. Super. 1999).

The suppression court grounded its conclusion that Appellant was not in custody at the time of his inculpatory statement on the following factual findings:

Swissvale [B]orough Police Officer, David Zacchia, received a call at approximately 9:30 [p.m.] from county dispatch asking him to be on the lookout for a Maroon Chevy Impala or Malibu that may have been involved in a homicide in Kennedy Township. Five minutes after receiving that call, Officer Zacchia observed [a] vehicle matching that description parked on Florence Street, near Monroe Street. This was near the address [that] dispatch had given to him to check for the vehicle. When he advised dispatch that he had located the vehicle, a message from Allegheny County Police was relayed, asking him to watch the vehicle.

Approximately forty … minutes later, the officer observed that the lights on the vehicle came on and the vehicle began to move. He followed the vehicle and notified dispatch of its movement. He was then advised that the Allegheny County Police wanted him to effectuate a stop of the vehicle. He followed the vehicle around the block where it parked once again in front of 2018 Monroe Street. One male exited the vehicle and Officer Zacchia then effectuated the stop of that individual, later identified as Brandon Lind. While detaining Lind, … Joe Stevens, later identified as Mr. Lind's stepfather, exited the house with another male, later identified as Michael Shearn. Mr. Ste[v]ens stated that a third individual, [Appellant], … was in the house and [Appellant] [w]as requested to come out of the house as well. Officer Zacchia notified county dispatch that he detained three individuals and he was asked if he could take them to the police station until county homicide could pick them up. Complying with that request, Officer Zacchia and other police officers transported the three individuals back to the Swissvale police station. Officer Zacchia testified that pursuant to police policy, each individual was frisked, handcuffed and then placed in a marked police vehicle for transportation back to the police station. He agreed that they were detained at that time.

Daniel Mayer, a detective with the Allegheny County Police Homicide Unit, testified that he first encountered [Appellant] at approximately 1:00 a[.]m[.] at county homicide's offices. He indicated that Mr. Lee had been brought there by Swissvale police because, based on the information they had gather[ed] from the original scene [of the homicide] in Kennedy Township, [Appellant] could possibly be an eye witness. He said that [Appellant] was not shackled and was sitting in an unlocked interview room when they arrived. He did not Mirandize [Appellant] because he did not believe him to be a suspect and

was not considered in custody. He asked [Appellant] to provide a timeline of where he had been the previous evening. [Appellant] told them where he had been. After telling the officers where he had been, [Appellant] agreed to provide a voluntary, recorded statement. Upon completion of that statement, he … left.

Detective Mayer said that he told [Appellant] that he was free to leave at any time. The questioning began at 1:00 a.m. and the recorded statement was completed by 3:35 a.m. [Appellant] was not responding to questions during that entire time. The officers came and went from the conference room and [Appellant] was offered food and drink and access to the bathroom. From the time [Appellant] was detained by Officer Zacchia until he left the Homicide Unit's offices, approximately five hours elapsed. [Appellant] did not testify nor offer any other evidence at the suppression hearing.

Trial Court Supplemental Opinion (TCSO), 4/19/16, at 3-6.

From these facts, the trial court concluded:

The focus of this inquiry must be on whether the circumstances were such that at the time [Appellant] gave the challenged statement, he believed that he was in custody; that he believed that he was not free to leave. The undisputed testimony of [D]etective M[a]yer, who conducted the interview of [Appellant], was that [Appellant] was told that … he was not in custody and was free to leave at any time. [Appellant] was not handcuffed or locked in a room. He was provided access to food, water and bathroom breaks. It is clear that at any time, had he chosen to do so, [Appellant] could have ended the questioning and left the Allegheny County Police Department, Homicide Bureau. The fact that earlier in the evening, he was in the custody of the Swissvale Police Department does not obviate the fact that *at the time of this questioning*, he was not in custody. He was being questioned as a witness to a homicide. He voluntarily remained to answer questions and left when that questioning was completed. As this was not a custodial interrogation, a *Miranda* warning was not required nor was the presence of a parent required. Accordingly, the motion to suppress was properly denied.

*Id.* at 7-8 (emphasis in original).

- 9 -

In applying the totality of the circumstances test, we begin with a notable difference between the trial court's and the suppression court's opinions. The trial court concluded that Appellant was not under arrest at the time Officer Zacchia brought him in, but was instead detained because he "was believed to be an eyewitness." Trial Court Opinion (TCO), 2/25/15, at 23. The trial court's opinion leaves the impression that Appellant may not have been in custody for **Miranda** purposes at the time of his initial detention. The suppression court's opinion, by contrast, accepts that Appellant was in custody at that time, but states that he was not in custody several hours later when he gave his recorded, inculpatory statement to police. We are in agreement with both Appellant and the suppression court that, regardless of the reason for his detention, Appellant was most certainly in custody when Officer Zacchia handcuffed him and transported him to the Allegheny County Homicide Unit's offices.

Officer Zacchia testified that he was instructed to detain Appellant and his associates. N.T., 11/25/13, at 10. Appellant was subjected to a pat-down for weapons. *Id.* at 12. Appellant was handcuffed, and then transported in a marked police vehicle. *Id.* at 13. Officer Zacchia was asked if Appellant was "being detained by police officers?" *Id.* He responded, "Yes." Officer Zacchia was asked if Appellant was "free to leave at that point?" *Id.* He answered, "No."

Based on these undisputed facts, it is clear that Appellant was in custody when detained by Officer Zacchia. ***See Commonwealth v.***

***Sepulveda***, 855 A.2d 783, 790 (Pa. 2004) (holding that a defendant was "clearly deprived of his freedom of action when" a police officer "handcuffed him, placed him in the back of the patrol car, and locked the door[,]" such that "he was indeed in custody for ***Miranda*** purposes at that time"). The question remains, however, whether Appellant was still in custody at the time he gave his recorded, inculpatory statement a few hours later, and whether that statement was the fruit of a police interrogation. While we agree with the suppression court that the question of whether Appellant was in custody when he made his inculpatory statement is distinct from whether he was in custody when detained by the Swissvale police, we disagree with the suppression court's suggestion that these matters are unrelated.

The suppression court's assessment of whether Appellant was in custody when interviewed by Detective Mayer appears to disregard Appellant's detention by Officer Zacchia a few hours earlier. If so, that was error. Under the totality-of-the-circumstances standard, Appellant's earlier detention was, at least, one of the factors that must be considered when assessing whether Appellant was in custody when he gave his inculpatory statement. This is not a case where a statement was made after a *clear* break in custody occurred between a custodial detention and a subsequently issued statement. Indeed, the very question before us hinges on whether such a break in custody actually occurred at all.

Therefore, properly framed, the issue before us is whether Appellant ceased being in custody for ***Miranda*** purpose after his initial detention by

- 11 -

Officer Zacchia, but before he gave his inculpatory statement to Detective Mayer.  The suppression court cited the following factors weighing against a finding that Appellant was in custody when he gave his statement as follows: 1) Appellant was told by Detective Mayer that he was not in custody, and that he was free to leave; 2) Appellant "was not shackled and was sitting in an unlocked interview room"; 3) Appellant was "provided access to food, water and bathroom breaks"; and 4) Appellant was not initially a suspect, but was brought in as a potential witness.  TCSO, at 3-8.

The first three of these factors are largely uncontested by Appellant. However, regarding the third, we note that it is unclear why, as is implied, an individual under arrest or 'in custody' would not be permitted to eat, drink, or use the bathroom.  Every prisoner in Pennsylvania is afforded these basic necessities with obvious regularity.  The refusal to grant access to such things is certainly demonstrative of coercion.  However, the opposite circumstance does not tend to suggest the absence of a custodial interrogation with equal vigor.[5]

_____

[5] To analogize: choking a witness/suspect until he makes a statement is certainly compelling evidence of coercive police tactics.  However, the opposite circumstance is not compelling evidence of anything.  Failing to choke a witness/suspect during police questioning is not particularly strong evidence of the absence of a custodial interrogation.  Not choking a witness/suspect should be routine, whether or not a custodial interrogation is underway.

We recognize that if Appellant were denied food, water, and access to a bathroom, it would be relevant to whether he was subjected to coercive conditions such that his statement was rendered involuntarily. It is also potentially relevant to whether "the conditions and/or duration of the detention *become* so coercive as to constitute the functional equivalent of arrest." *Mannion*, 725 A.2d at 200 (emphasis added). However, that formulation presupposes that a police detention was initially not custodial, but, due to coercive interrogation techniques or conditions, became so at a later time. In that sense, a non-custodial detention might become custodial if, among other things, a defendant were denied access to these necessities. Yet, here, the question is whether a custodial detention *ceased* being custodial by the time Appellant gave his statement. In these circumstances, the availability of food, water, and access to a bathroom are less relevant to that determination. Thus, although we agree that this factor informs our totality-of-the-circumstances analysis in the most general sense, we conclude that this factor is less relevant, presently, than it would be if we were considering an opposite sequence of development in Appellant's custodial status.

With regard to the fourth factor, Appellant argues that the record does not support the suppression court's finding that he was not a suspect when he was detained or, at least, at the time he gave the contested statement. Appellant notes, correctly, that "[t]he subjective mindset of the interrogating officers is irrelevant." Appellant's Brief, at 27 (citing *Commonwealth v.*

*Williams*, 650 A.2d 429, 427 (Pa. 1994) ("The test for custodial interrogation does not depend upon the subjective intent of the law enforcement interrogator.")). Nevertheless, the *Mannion* case suggests that "the basis for the detention" is a relevant factor in our totality-of-the-circumstances analysis. *Mannion*, 725 A.2d at 200. However, this is not necessarily a conflict of law. Synthesizing these authorities, the law is that the objective basis for Appellant's detention is relevant to our analysis, but it is not controlled by the officers' subjective view of whether Appellant was a suspect.

Here, the basis of the detention was clearly related to a homicide investigation. Officer Zacchia responded to a dispatch call regarding a vehicle that was suspected as being involved in a homicide. N.T., 11/25/13, at 7; TCSO, at 3. Officer Zacchia observed that vehicle "near an area where they expected that it would be coming back to, unoccupied." N.T., 11/25/13, at 7. Soon thereafter, he initiated a traffic stop after Brandon Lind tried to drive the vehicle away. *Id.* at 9. At that point, Joe Stevens, Lind's stepfather, exited a house with Michael Shearn, who Stevens claimed had been with Lind earlier that evening. *Id.* at 10. Stevens then told Officer Zacchia that Appellant was still inside the house. *Id.* Appellant emerged soon thereafter. *Id.* At that point, Officer Zacchia told county police that "we had these three individuals, and they asked if we could detain them at our police station until they could arrive to take custody."

*Id.* These events occurred from approximately 9:30 p.m. until 10:10 p.m. on the evening of June 19, 2012. *Id.* at 6, 8.

Appellant was subsequently transported to the Allegheny County Homicide Unit's offices, where Detective Mayer testified that he began interviewing Appellant at approximately 1:00 a.m. on June 20, 2012. *Id.* at 24. It is unclear from the record what occurred in the three hours between Officer Zacchia's detention of Appellant and his first contact with Detective Mayer, although it was established that Appellant was transported by Swissvale police to the offices of the Allegheny County Police Department during this time.[6] Detective Mayer believed that Appellant was transported from the Swissvale Police Station to the Allegheny County Police Department, but he could not testify as to whether Appellant was in restraints at that time. *Id.* at 37; 39.

_____

[6] For reference, the distance between the Swissvale Police Department and the offices of the Allegheny County Police Department is approximately 2½ miles. The address where Appellant was detained is a few blocks away, or ½ mile, from the Swissvale Police station. It is not clear whether Appellant and his cohorts were transported directly to the Allegheny County Police Department from the site of their detention just after 10:00 p.m. However, Appellant did not come in contact with Detective Mayer until 1:00 a.m., and Officer Zacchia testified that "[n]one of the individuals that were detained that evening were listed as being secured in the [Swissvale Police] station." *Id.* at 11. Thus, we can assume that, for the majority of this three hour span of time, Appellant was at, or in transport to, the Allegheny County Police Department. Kennedy Township, the scene of the homicide, is approximately 15 miles west of Swissvale on the opposite side of downtown Pittsburgh.

Indeed, Detective Mayer was not particularly precise when he was asked if Appellant was "in shackles" when he interviewed him. Rather than responding with a simple yes or no, Detective Mayer answered, "I don't believe so." *Id.* at 24. When asked if he knew if someone took Appellant's handcuffs off when he arrived at the Homicide offices, Detective Mayer answered, "I do not." *Id.* at 37-38. He also didn't "recall" if he took the handcuffs off himself. *Id.* at 38. He ultimately admitted that he "could not confirm or deny that [Appellant] was in handcuffs when he was brought to the Homicide office." *Id.* at 39.

Given Detective's Mayer's ambiguous testimony, we are compelled to conclude that the record does not support the suppression court's conclusion that Appellant was unrestrained when interviewed. The only testimony supporting this fact was the qualified answer by Detective Mayer that he didn't "believe" Appellant was shackled at that time. However, it is undisputed that Appellant was cuffed by Officer Zacchia. Detective Mayer's subsequently developed testimony demonstrates that he did not know if Appellant was handcuffed when he arrived at the Allegheny County Police Department. He also could not recall whether he, or anyone else, removed Appellant's restraints. Clearly, Detective Mayer could not testify with any degree of certainty whether Appellant was restrained when interviewed. Given this uncertainty, we cannot accept the suppression court's factual conclusion that Appellant was not restrained at this time. At best, the record

neither confirms nor refutes whether Appellant was restrained during the interview.

As such, it gives us great pause when considering whether Appellant was truly "free to leave" during this time. Appellant's encounter with police began with the functional equivalent of an arrest. Hours later, crediting the unambiguous testimony of Detective Mayer, Appellant was told he was free to leave, and was offered nourishment and the exercise of universal, basic bodily functions. However, the context of these factors, which may independently suggest that Appellant was not in custody during the interview, make that conclusion doubtful.

Appellant was sixteen years old when these events occurred. He was taken into custody late in the evening, and his interview with Detective Mayer did not even begin until an hour after midnight, and continued, sporadically, for nearly three hours before the recorded statement was taken. Appellant did not have a parent or guardian present when he was ostensibly advised that he was free to leave at any time, although Detective Mayer acknowledged that he knew Appellant was a minor. *Id.* at 42. Yet, Detective Mayer made no attempts to contact a parent or guardian on behalf of Appellant.[7] This was excused by the suppression court because Appellant

_____

[7] At trial, Appellant's mother testified: that she went to the Allegheny County Police Department at approximately 10:30 or 11:00 p.m. on the evening of the murder; that she told the guard on duty that they had her son; that she waited in the lobby there until 5:00 a.m. when Appellant was released; and
*(Footnote Continued Next Page)*

was only viewed as a potential witness, not as a suspect being subjected to a custodial interrogation.

This conclusion, that Appellant was not a suspect, is also questionable. Detective Mayer testified that "based on the information we had **gathered from the original scene** [of the homicide] at Kennedy Township, we felt that [Appellant] could be a possible eyewitness." *Id.* at 24 (emphasis added). He then testified: "So we sat down with [Appellant] and asked him to just give us a timeline, an idea of where he was the previous evening. And he told us." *Id.* at 25. After Appellant conveyed this information to Detective Mayer, Appellant "agreed to provide a voluntary recorded statement." *Id.* at 33.

The evidence *from the scene of the crime* that pointed to Appellant as a witness, but not a suspect, is not part of the record. However, we can deduce from Detective Mayer's testimony that Appellant's presence with Lind and Shearn in Swissvale was not the sole basis for his questioning. Something discovered (or heard) by the police at the scene of the crime pointed to Appellant. Appellant was also discovered near a vehicle suspected of being involved in the homicide, and in the presence of someone

_____

*(Footnote Continued)* ———————————————

that no one attempted to discuss Appellant's situation with her during that time. **See** N.T. Trial, 12/5/13-12/13/13, at 752-756. However, as our scope of review is limited to the suppression transcript, we do not consider these otherwise uncontradicted facts in our analysis.

driving that vehicle. All these factors point to Appellant's being more than a mere witness. Or, at least, it should have.

The police knew Appellant was at the scene of the crime, and that he was found with the other persons of interest at the location where the potential getaway vehicle was located.[8] That vehicle was discovered by police based upon information they received regarding a specific address; the same address from which Appellant emerged, and which was connected to Lind. *Id.* at 7-9. It defies reason to believe that Appellant was not viewed, in these circumstances, as a potential accomplice to the homicide, before, during, or after the fact, even if the police did not know his specific role in the murder or his degree of culpability.

Thus, we cannot accept the suppression court's factual conclusion that Appellant was not a suspect when detained. Indeed, accepting that proposition requires this Court to ascribe a level of naiveté or incompetence to Detective Mayer that we are not willing to assume, nor which is evidenced by his twenty-one years' experience as a police officer. *Id.* at 22-23. The only reasonable explanation for detaining a sixteen-year-old child overnight, without the presence of a parent, and given the circumstances that led up to his detention, is that there was some suspicion regarding his participation in

_____

[8] Although there is no explicit testimony that the vehicle was suspected of being a "getaway" vehicle, there is no other explanation offered in the record before the suppression court, nor does any party, or the lower court, make any attempt to dispel such an assumption.

the homicide. The suppression court's cursory analysis of this aspect of Appellant's claim appears to be based exclusively on Detective Mayer's subjective belief that Appellant was a mere witness immediately prior to or during his recorded statement. However, the use of Detective Mayer's subjective belief regarding Appellant's status as a witness or a suspect, by itself, runs contrary to the objective, totality-of-the-circumstances standard that applies to our analysis of whether Appellant was subjected to a custodial interrogation.

For the aforementioned reasons, we conclude that, in the totality of the circumstances, Appellant remained in custody from the time he was detained by Officer Zacchia until he was released, following his incriminating, recorded statement. Appellant, a minor when the crime occurred, was cuffed and transported to the offices of the Allegheny County Homicide Unit. This occurred late in the evening, and Appellant was held and questioned by police overnight, without the presence of a parent, until he issued an incriminating, recorded statement in the early hours of the following morning. The evidence is ambiguous as to whether Appellant's restraints were ever removed, although he was told he was free to go and offered food, drink, and bathroom breaks.[9] The purpose of this interrogation was

_____

[9] Appellant does not challenge the suppression court's factual finding that he was told he was free to leave by Detective Mayer. However, Appellant implores that this Court consider that fact in the appropriate context: that Appellant was minor, told this outside the presence of an attorney, parent, *(Footnote Continued Next Page)*

due to some degree of suspicion regarding Appellant's involvement in the shooting death of Jordan Coyner, despite Detective Mayer's subjective belief to the contrary. In these circumstances, we concluded that Appellant was involuntarily subjected to a custodial interrogation, and yet he was not afforded his *Miranda* rights.[10]

Our decision in this regard is buttressed by the fact that at no time during Appellant's obviously incriminating recorded statement[11] did Detective Mayer stop to afford Appellant his *Miranda* rights, and/or permit

---

*(Footnote Continued)* ───────────

guardian, or other responsible adult to advise him; and that he was told this in the middle of the night, at a police station in a community that was not his own. Appellant's Brief, at 25-26. We agree with Appellant that Detective Mayer's statement, like his subjective belief regarding Appellant's status as a mere witness, must be considered in the totality of the circumstances, and is not alone dispositive of whether he was subjected to a custodial interrogation.

[10] The fact that no *Miranda* warnings were read to Appellant is not in dispute.

[11] We note that there is no dispute that Appellant's statement was inculpatory, or even that it was remotely ambiguous in that regard. Nevertheless, a review of the trial transcript indicates Appellant's statement was unambiguously inculpatory. The statement was played for the jury during Appellant's trial. *See* N.T., 12/5/13-12/13/13 (Vol. I), at 446-452. In his statement, Appellant made the following admissions: he placed himself in the presence of the conspirators, in the car under suspicion as playing a role in the murder of Coyner, on the day of the murder. *Id.* at 447. He had a conversation with another individual who suggested that they commit a robbery. *Id.* at 448. After that conversation, he rode with the other coconspirators to the victim's house, got out of the vehicle, and waited while another individual went into the house. *Id.* at 449. Once he heard shots fired, he fled with the shooter back to the vehicle. *Id.* at 449-450.

him consultation with a parent regarding his "choice" to incriminate himself in that manner. It is simply not plausible that Detective Mayer did not understand the incriminating nature of Appellant's statement. It also appears implausible that nothing during the interview that preceded the recorded statement indicated that Appellant was potentially incriminating himself by placing himself at the scene of the crime with the other conspirators.

Finally, we must address the Commonwealth's claim that this *Miranda* violation constituted harmless error. The Commonwealth argues that Appellant "used the statement[] to his benefit during his trial, and would not have been able to advance many of his arguments without [its] admission[,]" ostensibly minimizing or eliminating any prejudice caused by the statement's admission. Commonwealth's Brief, at 33. The Commonwealth also contends that the *Miranda* violation was harmless error because the jury was instructed to contemplate whether *Miranda* was violated in considering the voluntariness of Appellant's statement. *See* N.T., 12/5/13-12/13/13, at 889-91.

Indeed, Appellant did attempt, albeit unsuccessfully, to utilize his inculpatory statement to police to minimize his culpability at trial. However, the Commonwealth's line of argument ignores a simple truth: that Appellant sought suppression of the statement, failed in that endeavor, and then made the best of that inculpatory evidence. We simply cannot countenance the argument that Appellant effectively abandoned his suppression claim by

trying to construe his own highly inculpatory statement in the best light possible before the jury, particularly where it is obvious that his first choice was to have that statement suppressed.

The only case cited by the Commonwealth in support of this argument is **Commonwealth v. Baez**, 720 A.2d 711, 720 (Pa. 1998). It is certainly true that "[a] suppression court's error regarding failure to suppress statements by the accused will not require reversal if the Commonwealth can establish beyond a reasonable doubt that the error was harmless." **Id.** at 720 (citing **Commonwealth v. Fay**, 344 A.2d 473, 474 (Pa. 1975)). However, in **Baez**, the Supreme Court found that no **Miranda** violation occurred. Nevertheless, the **Baez** Court held that even *if* such a violation occurred, the defendant's contested, *exculpatory* statement was substantially similar to statements the defendant made after he was properly Mirandized, thus rendering any previous **Miranda** violation harmless. **Id.** This does not support the Commonwealth's argument. Here, no other statements made by Appellant were properly admitted that were substantially similar to the contested statement, and Appellant's statement was clearly inculpatory, not exculpatory.[12]

_____

[12] **Fay** also does not support the Commonwealth's argument. In that case, our Supreme Court considered whether physical evidence, a gun, discovered as a result of a custodial interrogation, should have been suppressed because the police failed to give **Miranda** warnings. The Court found any possible error on **Miranda** grounds was harmless because five eyewitnesses testified that Appellant shot the victim with the weapon and, consequently,
*(Footnote Continued Next Page)*

The Commonwealth's second harmless error argument is equally unconvincing. The Commonwealth cites no authorities that suggest that the failure to suppress a statement on *Miranda* grounds can be rendered harmless if the jury is instructed on the voluntariness of a defendant's statement that includes references and/or consideration of whether *Miranda* was violated. Indeed, the Commonwealth's argument conflates suppression of the evidence with the factfinder's province of weighing admitted evidence. It is axiomatic that the jury plays no role in determining whether *Miranda* was violated, nor does it play a role in determining the appropriate *legal* remedy for such a violation. Certainly, the jury could have concluded that Appellant's statement was not voluntary and, therefore, afforded the content of that statement little or no weight. However, that is a wholly separate issue from whether the statement should not have been before the jury at all. Accordingly, for all the aforementioned reasons, we conclude that the Commonwealth has failed to prove, beyond a reasonable doubt, that the

*(Footnote Continued)* ————————————

the "introduction of the weapon in no way prejudiced [the] appellant's case, since even without its introduction the witnesses could have testified to [the] appellant's shooting of a gun at the decedent." *Fay*, 344 A.2d at 474. Instantly, the impact of Appellant's inculpatory statement cannot be fairly compared to physical evidence which does not, by itself, inculpate a defendant. Furthermore, it was the Commonwealth's other evidence in *Fay* that rendered the admission of the gun harmless. Here, the Commonwealth makes an altogether different argument: that Appellant's attempts to downplay the negative impact of his inculpatory statement rendered admission of that statement harmless.

denial of Appellant's ***Miranda***-based suppression motion constituted harmless error.

Accordingly, as Appellant's incriminating statement should have been suppressed, and because that error was not harmless, we reverse the order denying suppression, vacate Appellant's judgment of sentence, and grant him a new trial.

Despite our decision in this regard, we must also resolve Appellant's claim that the lower court erred when it denied his petition to transfer proceedings to juvenile court.

> The issue of certification between the juvenile and criminal divisions is jurisdictional and, therefore, not waivable. ***Commonwealth v. Johnson***, 542 Pa. 568, 669 A.2d 315, 320–321 (1995). Decisions of whether to grant decertification will not be overturned absent a gross abuse of discretion. ***Commonwealth v. Aziz***, 724 A.2d 371, 378 (Pa. Super. 1999), *appeal denied*, 563 Pa. 670, 759 A.2d 919 (2000). An abuse of discretion is not merely an error of judgment but involves the misapplication or overriding of the law or the exercise of a manifestly unreasonable judgment passed upon partiality, prejudice or ill will. ***Commonwealth v. McGinnis***, 450 Pa.Super. 310, 675 A.2d 1282, 1285 (1996).

***Commonwealth v. Sanders***, 814 A.2d 1248, 1250 (Pa. Super. 2003).

> The Juvenile Act, 42 Pa.C.S.A. § 6301 *et seq.*, is designed to effectuate the protection of the public by providing children who commit "delinquent acts" with supervision, rehabilitation, and care while promoting responsibility and the ability to become a productive member of the community. 42 Pa.C.S.A. § 6301(b)(2). The Juvenile Act defines a "child" as a person who is under eighteen years of age. 42 Pa.C.S.A. § 6302. Typically, most crimes involving juveniles are tried in the juvenile court of the Court of Common Pleas.

Our legislature, however, has deemed some crimes so heinous that they are excluded from the definition of "a delinquent act." Pursuant to 42 Pa.C.S.A. § 6322(a) and § 6355(e), when a juvenile is charged with a crime, including murder or any of the other offenses excluded from the definition of "delinquent act" in 42 Pa.C.S.A. § 6302, the criminal division of the Court of Common Pleas is vested with jurisdiction. **_See_** 42 Pa.C.S.A. § 6302 (stating that a "delinquent act" shall not include the crime of murder); **_Commonwealth v. Ramos_**, 920 A.2d 1253, 1258 (Pa. Super. 2007).

When a case involving a juvenile goes directly to the criminal division, the juvenile can request treatment within the juvenile system through a transfer process called "decertification." **_Commonwealth v. Sanders_**, 814 A.2d 1248, 1250 (Pa. Super. 2003). To obtain decertification, it is the juvenile's burden to prove, by a preponderance of the evidence, that transfer to the juvenile court system best serves the public interest. 42 Pa.C.S.A. § 6322(a); **_Commonwealth v. Smith_**, 950 A.2d 327, 328 (Pa. Super. 2008). Pursuant to § 6322(a), the decertification court shall consider the factors contained in § 6355(a)(4)(iii) in determining whether the child has established that the transfer will serve the public interest. These factors are as follows:

(A) the impact of the offense on the victim or victims;

(B) the impact of the offense on the community;

(C) the threat to the safety of the public or any individual posed by the child;

(D) the nature and circumstances of the offense allegedly committed by the child;

(E) the degree of the child's culpability;

(F) the adequacy and duration of dispositional alternatives available under this chapter and in the adult criminal justice system; and

(G) whether the child is amenable to treatment, supervision or rehabilitation as a juvenile by considering the following factors:

(I) age;

(II) mental capacity;

(III) maturity;

(IV) the degree of criminal sophistication exhibited by the child;

(V) previous records, if any;

(VI) the nature and extent of any prior delinquent history, including the success or failure of any previous attempts by the juvenile court to rehabilitate the child;

(VII) whether the child can be rehabilitated prior to the expiration of the juvenile court jurisdiction;

(VIII) probation or institutional reports, if any;

(IX) any other relevant factors;

42 Pa.C.S.A. § 6355(a)(4)(iii) [].

While the Juvenile Act requires that a decertification court consider all of these factors, it is silent as to the weight assessed to each by the court. *Sanders*, 814 A.2d at 1251. However, "[w]hen a juvenile seeks to have his case transferred from the criminal division to the juvenile division, he must show that he is in need of and amenable to treatment, supervision or rehabilitation in the juvenile system." *Commonwealth v. Johnson*, 542 Pa. 568, 669 A.2d 315, 320–321 (1995). "If the evidence presented fails to establish that the youth would benefit from the special features and programs of the juvenile system and there is no special reason for sparing the youth from adult prosecution, the petition must be denied and jurisdiction remains with the criminal division." *Id.*

*Commonwealth v. Brown*, 26 A.3d 485, 491-93 (Pa. Super. 2011)

(emphasis omitted).

Appellant divides his decertification claim into three subparts. First, he

argues the decertification court

grossly abused its discretion by relying on the testimony of Dr. Wright in violation of [Appellant]'s right against self-incrimination, as Dr. Wright's conclusion that [Appellant] was not

- 27 -

amenable to rehabilitation was based on [Appellant]'s exercise of his absolute Constitutional right to refuse to discuss the details of his charges with a state agent.

Appellant's Brief, at 35 (italics omitted).

The bulk of Appellant's argument in this regard is directed at the trial court's opinion. That opinion relied, *inter alia*, on Appellant's failure to communicate with Dr. Wright as a factor in concluding that the decertification court had not erred in finding that Appellant was not amenable to treatment in the juvenile system. **See** TCO at 19-20. We agree with Appellant that consideration of that factor would be improper in light of Appellant's Fifth Amendment right against self-incrimination. **See** **generally Commonwealth v. Brown**, 26 A.3d 485 (Pa. Super. 2011) (holding that the Fifth Amendment applies to decertification proceedings, that requiring an admission of guilt to demonstrate amenability to treatment violated the Fifth Amendment privilege against self-incrimination, and that invoking the Fifth Amendment during a psychological evaluation was not required to preserve the right).

However, the supplemental opinion filed by the decertification court does not cite Appellant's failure to cooperate with Dr. Wright when explaining the decision to deny decertification. Instead, the supplemental opinion states that the first five 42 Pa.C.S. § 6355(a)(4)(iii) factors all weighed against decertification:

The evidence presented at the hearing established that … there was a plan to commit the robbery that led to the death of the victim. It was not spontaneous; it was planned and the evidence tended to show that [Appellant] participated in that planning.

Moreover, [Appellant] knew that a gun would be present and used in the robbery. Nevertheless, he agreed to participate in the robbery and go along with the other individuals involved. His culpability, though not at the highest level as he did not pull the trigger, was at least equal to that of the other individuals involved in this plan to rob the victim at gunpoint.

Obviously, the impact o[n] the victim was the most serious impact possible in a criminal matter as he was murdered. The offense also impacts the community in the manner that all violent deaths in a community have an impact. [Appellant's] involvement, at the age of 16, in a planned, violent, armed robbery, certainly established that [he] poses a continuing threat to the community. His age also would not permit a lengthy period of rehabilitation before Juvenile Court jurisdiction would terminate.

TCSO, at 9-10.

The supplemental opinion only mentions Dr. Wright's testimony briefly, as follows:

The court weighed these factors and evaluated the testimony of the conflicting experts. The [c]ourt found the testimony of Dr. Wright more credible and afforded that testimony the greater weight[.] Based on this, the [c]ourt concluded that [Appellant] failed to establish that transfer of his case to Juvenile Court would serve the public interest.

*Id.* at 10. Thus, the decertification court did not draw any attention to Appellant's refusal to speak with Dr. Wright.

Moreover, when cross-examined on this point, Dr. Wright acknowledged that Appellant was advised by his attorney to not answer specific questions about his criminal conduct. N.T., 5/28/13, at 126-128. While Dr. Wright did not mention that fact during direct examination, he testified that he noted it in his report. *Id.* at 128. During this exchange with defense counsel, the decertification court twice commented in a manner

consistent with an accurate understanding of Appellant's Fifth Amendment rights during a psychological examination performed for the purpose of assisting in a decertification proceeding. *See id*. at 127 ("He has a right to refuse to answer [Dr. Wright's questions], I suppose."); *id.* (responding to defense counsel's statement that Appellant's refusal to answer Dr. Wright's questions was prompted by counsel's instructions to Appellant, the decertification court stated, "I suppose you have a right to instruct him of that, too"). Accordingly, the record does not support Appellant's claim that the decertification court considered his refusal to answer Dr. Wright's questions as a factor in denying decertification.

We conclude that the denial of Appellant's decertification petition was not based in any substantial degree on, or was made independent of, Appellant's failure to communicate with Dr. Wright during his psychological evaluation. Thus, the denial did not implicate Appellant's Fifth Amendment right against self-incrimination. Accordingly, the first prong of Appellant's decertification argument lacks merit.

Next, Appellant argues: "The [decertification] court grossly abused its discretion in denying [Appellant]'s decertification to juvenile court, as [Appellant] established by a preponderance of the evidence that he was amenable to treatment and decertification was in the public's interest." Appellant's Brief, at 41. Basically, Appellant argues that the statutory factors set forth in 42 Pa.C.S. § 6355(a)(4)(iii) generally weigh in his favor, contrary to the assessment of the decertification court.

With regard to the crime, Appellant construes his involvement as minimal, with references to the record supporting his assertion. Appellant's Brief, at 42-43. Appellant also relies on the assessment of his expert witness, Dr. Applegate, who concluded that Appellant was amenable to treatment within the juvenile system despite the gravity of the crime and his advanced age (relative to the limited timeline for providing rehabilitation in the juvenile system). *Id.* at 43-44. Appellant also cites the testimony of Robert Luczak, who tended to corroborate Dr. Applegate's evaluation. *Id.* at 44-45.

Appellant criticizes Dr. Wright's assessment, which was based primarily on the cold record of Appellant's school, police, and medical reports. *Id.* at 45. Appellant reiterates his concerns regarding Dr. Wright's use of Appellant's silence as a reason to find him not amenable to rehabilitation in the juvenile system. *Id.* at 45-46. Appellant is also highly critical of Dr. Wright's qualifications, given that Dr. Wright, unlike Dr. Applegate, had no specialty in juvenile psychology or experience in the treatment/rehabilitation of juvenile criminal defendants. *Id.* at 45.

As noted above, the trial court denied Appellant's decertification petition based on a variety of factors. *See* TCSO, at 9-10. While Appellant argues that his involvement in the crimes was minimal and/or not evidence of significant criminal sophistication, it was not an abuse of the court's discretion to reject consideration of the facts in a light most favorable to Appellant, nor was it outside the court's discretion to assess more weight to

the gravity of the crime and its impact on the victim and the community than to Appellant's relatively lesser degree of involvement than certain other coconspirators. In any event, the evidence was mixed regarding Appellant's culpability: the statements made by Appellant's coconspirators diverged greatly in that regard, and it was not incumbent upon the court to presume the least degree of involvement that could be ascertained by that evidence. Moreover, the decertification court was free to give Dr. Wright's expert testimony more weight than the testimony of Dr. Applegate and/or Robert Luczak. Thus, we are constrained to agree that the decertification court did not err or abuse its discretion when evaluating the statutory factors pertinent to denying Appellant's transfer to juvenile court.

Finally, Appellant claims that "[t]he [decertification] court abused its discretion by denying [Appellant]'s right to call a witness on his behalf, after the Commonwealth failed to subpoena the witness despite the [c]ourt ordering it to do so." Appellant's Brief, at 47 (italics omitted). Specifically, defense counsel

> wanted to call Michael Shearn, who was not charged in any way in connection to Jordan Coyner's murder, yet was present with all charged parties throughout the night in question. [Defense counsel] sought Shearn's testimony to highlight [Appellant]'s lack of criminal sophistication in the planning and execution of the attempted robbery, and that [Appellant] was less criminally involved than Shearn – whom the Commonwealth did not charge with anything at any level relating to the murder.

Appellant's Brief, at 47.

This claim was first raised during the decertification hearing. However, Appellant re-raised this claim in his post-sentence motion, and the trial court allowed Appellant to develop the claim at a post-trial hearing held on June 11, 2014. Ultimately, the trial court refused to grant relief because Appellant

> was unable to demonstrate that the proposed testimony was either material or favorable to his petition to transfer proceedings to juvenile court. The extent of Mr. Shearn's involvement in the incident, and his degree of criminal sophistication, were not probative of Appellant's culpability, criminal sophistication, and amenability to treatment as a juvenile. The connection that counsel sought to make was logically unsound.

TCO at 28. Moreover, the trial court found that Appellant

> was not deprived of any arguable benefit of Mr. Shearn's testimony. Mr. Shearn's testimony at the preliminary hearing was submitted by the Commonwealth and used extensively by the defense in cross-examining the Commonwealth's expert witness. Defense counsel was able to make the point that Dr. Wright's analysis was based upon the co-defendant's statements, which indicated [Appellant] initiated, planned and actively participated in the crimes, rather than on Mr. Shearn's and others' statements which indicated that [Appellant] played only a minor, passive role. Counsel also was able to show that Mr. Shearn, who was not charged, appeared to display an equal if not greater level of criminal sophistication than [Appellant]. The only matter that the defense was precluded from developing was the reason why Mr. Shearn was not charged with any crimes arising from the incident. However, as Judge Manning astutely asserted, although that point was relevant to impeaching Mr. Shearn's credibility, it had nothing to do with the decertification proceedings.

*Id.* at 28-29.

We agree with the analysis of the trial court, and conclude that Appellant is not entitled to relief on this claim. As our Supreme Court has stated:

> The right to compulsory process encompasses the right to meet the prosecution's case with the aid of witnesses, and the right to elicit the aid of the Commonwealth in securing those witnesses at trial, both of which are fundamental to a fair trial. This constitutional right, though fundamental, is not, however, absolute. Evidentiary rules based on legitimate state interests which exclude certain witnesses or certain testimony are not inconsistent nor incompatible with the right to compulsory process.[4] Accordingly, where certain witnesses' testimony would not be admissible at trial, the Constitution does not require that a defendant be given the right to secure the attendance of witnesses which he has no right to use.
>
> > [4] Although a defendant has the right to have compulsory process to obtain witnesses in his behalf and, therefore, to have subpoenas issued, the determination of whether or not to allow a witness to take the stand is a matter within the discretion of the trial judge. *United States v. Maloney*, 241 F.Supp. 49 (W.D. Pa. 1965). *See*, *e.g.*, *Commonwealth v. Greene*, 445 Pa. 228, 285 A.2d 865 (1971), wherein this Court affirmed the trial court ruling disallowing a defendant from calling a witness who would probably invoke his Fifth Amendment privilege against self-incrimination.

*Commonwealth v. Jackson*, 324 A.2d 350, 354-55 (Pa. 1974).

Here, Appellant construes his claim as a compulsory process claim and, to be sure, the Commonwealth appears to have failed to some extent in its responsibility to secure Mr. Shearn's presence at Appellant's decertification hearing. However, the decertification court, and later the trial court, found that Mr. Shearn's testimony was nevertheless prohibited on relevancy grounds. Appellant provides little argument, and no case law,

supporting his claim that he was denied the opportunity to provide *relevant* testimony.

Moreover, to the extent Mr. Shearn's testimony potentially had some relevancy to Appellant's decertification, the trial court accurately notes that Appellant was able to raise such matters during the cross-examination of Dr. Wright, through the use of Mr. Shearn's prior statements. Appellant provides no argument as to how Mr. Shearn's testimony at the decertification hearing would have differed from his prior statements in a manner that could have benefited Appellant's argument for decertification. Accordingly, we conclude that the lower court did not abuse its discretion when it failed to compel Mr. Shearn's testimony at Appellant's decertification hearing.

In conclusion, we vacate Appellant's sentence and remand for a new trial because the suppression court erred when it denied his motion to suppress his statement to police on **Miranda** grounds. Appellant is not entitled to relief on any of his remaining claims.

Judgement of sentence **vacated**. Case **remanded** for a new trial consistent with this memorandum. Jurisdiction **relinquished**.

Judge Shogan joins this memorandum.

President Judge Emeritus Ford Elliott files a dissenting memorandum statement.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>9/7/2016</u>